Pfeifer, J.
{¶ 1} This case began with a default on credit-card debt by an Ohio consumer. It reaches this court because that consumer alleged violations of the federal Fan-Debt Collection Practices Act (“FDCPA”), 15 U.S.C. 1692 et seq., and the Ohio Consumer Sales Practices Act (“OCSPA”), R.C. 1345.01 et seq., by the entities that purchased her debt and were involved in suing her to collect on it. Today, we determine several issues relevant to the application of the FDCPA and the OCSPA to the collection of purchased credit-card debt in Ohio. We hold that the underlying cause of action for default on the credit card in this case accrued in Delaware, the home state of the bank that issued the credit card and where the consumer’s payments were made, and that Delaware’s statute of limitations— through operation of Ohio’s borrowing statute — determines whether the collection action was timely filed. We further hold that the filing of a time-barred collection action may form the basis of a violation under both the FDCPA and the OCSPA. We also hold that that a consumer can bring actionable claims under the FDCPA and the OCSPA based upon debt collectors’ representations made to courts in legal filings, specifically on a debt collector’s claim for interest that is unavailable to the debt collector by law. Finally, we hold that debt buyers collecting on credit-card debt and their attorneys are subject to the OCSPA.
*628 BACKGROUND
Using Courts to Collect Purchased Debt
{¶ 2} The questions presented to us arise from the now common phenomenon of debt sales, in which a creditor sells an individual’s debt to a private entity that then attempts to collect the debt. The sale of debt can provide grease for the wheels of commerce. “Debt buying can reduce the losses that creditors incur in providing credit, thereby allowing creditors to provide more credit at lower prices.” Federal Trade Commission, The Structure and Practices of the Debt Buying Industry (Jan.2013) i, available at http://www.fte.gov/sites/default/ files/documents/reports/structure-and-practices-debt-buying-industry/debtbuying report.pdf (accessed Mar. 14, 2016) (“Structure and Practices”). Private debt collectors often employ the court process to collect the debt that they have purchased, and thus, courts have become vital cogs in the machinery of debt collection. The threat of a lawsuit, a filed lawsuit, or a judgment can be a powerful, intimidating force against a consumer.

A Problematic Process

{¶ 3} First-party debts are debts owed by a consumer to an entity that initially extended credit to the consumer. Note, Improving Relief from Abusive Debt Collection Practices, 127 Harv.L.Rev. 1447 (2014), fn. 1. When a consumer falls in arrears on paying a debt, “first-party creditors frequently charge off the debt (that is, account for the debt as being unrecoverable) and sell the rights to the delinquent debt to debt buyers and collection agencies who specialize in the collection of delinquent debts.” Id., citing Consumer Financial Protection Bureau, Fair Debt Collection Practices Act: CFPB Annual Report 2013, at 8-9 (2013). Those debts are then “bundled” into portfolios, which are purchased by debt buyers through a bidding process, usually at a steep discount from the face value of the debts. Improving Relief at 1448.
{¶ 4} During the debt-sale process, documentation of information about the debt is often lost. Debt buyers receive some information about the debt, but “[f]or most portfolios, buyers did not receive any documents at the time of purchase” and “[o]nly a small percentage of portfolios included documents, such as account statements or the terms and conditions of credit.” Structure and Practices at iii. “Even when [account documents] are available and debt buyers request them, banks often require additional payments to supply them. Such demands can prove prohibitively expensive or encourage debt collectors to gather detailed evidence only in sporadic cases.” Horwitz, Banks Face Official Backlash Against Card Debt Collection Practices, American Banker (Jan. 16, 2013) 2, available at http://www.americanbanker.com/issues/178_12/banks-face-official- *629 backlash-against-card-debUcollection-practices-1055929-l.html?pg=2 (accessed Mar. 14, 2016).
{¶ 5} Debt collectors go to court with the information they have. As an industry that buys debt for an average of four cents per dollar of face value, Structure and Practices at ii, consumer-debt collection, by its very nature, is a high-volume enterprise. It is dependent in large part on the acquiescence, ambivalence, or ignorance of consumers:
The consumer debt collection industry is premised on a high-volume business model. Debt buyers holding portfolios of debts with a low ratio of book value to face value seek to collect on a sufficient number of debts to generate a profit, through direct collection efforts as well as lawsuits. Empirical evidence shows that many debt buyers using a high volume of lawsuits as a component of their recovery strategy rely heavily on the assumption that consumers often fail to show up to contest the case; this assumption is largely valid. There may be several reasons for such a failure to respond. Some of these reasons may themselves be related to FDCPA violations, including defective notice, or may stem from a (mistaken) consumer belief that no response is required if the debt being sued upon is not actually hers. Most simply, many consumers may not respond due to a misunderstanding of the legal procedures required to avoid default. In addition, some debt collectors rely on the assumption of default to pursue what has been called a “scattershot” approach, whereby they file many lawsuits with the hope of securing default judgments, but without the intent to actually litigate them should the opposing parties respond.
(Footnotes omitted.) Improving Relief, 127 Harv.L.Rev. at 1449.
{¶ 6} A predictable result of debt buyers filing a high volume of lawsuits based on imperfect information is that lawsuits are regularly filed after the right to collect debts has expired or that seek to collect a debt that is not owed; “each year, buyers sought to collect about one million debts that consumers asserted they did not owe.” Structure and Practices at iv.
Statutory Protections

The FDCPA

{¶ 7} Federal and state statutes in play in this case provide protections against such debt-collection abuses. “Congress passed the FDCPA to address ‘what it considered to be a widespread problem’ of consumer abuse at the hands of debt collectors.” Wise v. Zwicker & Assocs., P.C., 780 F.3d 710, 712-713 (6th *630 Cir.2015), quoting Frey v. Gangwish, 970 F.2d 1516, 1521 (6th Cir.1992). The intent of the FDCPA is to “eliminate abusive debt collection practices” that have contributed to personal bankruptcies, job loss, and invasions of individual privacy. 15 U.S.C. 1692(a) and (e); Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A., 559 U.S. 573, 577, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010). “In reaction to the size of the problem, [Congress] crafted ‘an extraordinarily broad’ remedial statute.” Wise at 713, quoting Frey at 1521. The FDCPA prohibits debt collectors from employing “any false, deceptive, or misleading representation or means in connection with the collection of any debt,” including misrepresenting “the character, amount, or legal status of any debt.” 15 U.S.C. 1692e(2)(A). A debt collector may not employ any “unfair or unconscionable means to collect or attempt to collect any debt,” 15 U.S.C. 1692f, and cannot collect “any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law,” 15 U.S.C. 1692f(l).
{¶ 8} When analyzing whether conduct giving rise to the claim fits within the broad scope of the FDCPA, “the conduct is viewed through the eyes of the ‘least sophisticated consumer.’ ” Currier v. First Resolution Invest. Corp., 762 F.3d 529, 533 (6th Cir.2014). That standard, while protecting “the gullible and the shrewd alike,” also presumes “a basic level of reasonableness and understanding on the part of the debtor.” Id.
{¶ 9} A plaintiff must prove four essential elements to establish a prima facie case for a violation of the FDCPA:
1. [T]he plaintiff is a natural person who is harmed by violations of the FDCPA, or is a “consumer” within the meaning of 15 U.S.C.A. §§ 1692a(3), 1692(d) for purposes of a cause of action, 15 U.S.C.A. § 1692c or 15 U.S.C.A. § 1692e(11);
2. [T]he “debt” arises out of a transaction entered primarily for personal, family, or household purposes, 15 U.S.C.A. § 1692a(5);
3. [T]he defendant collecting the debt is a “debt collector” within the meaning of 15 U.S.C.A. § 1692a(6); and
4. [T]he defendant has violated, by act or omission, a provision of the FDCPA, 15 U.S.C.A. § 1692a-1692o; 15 U.S.C.A. § 1692a; 15 U.S.C.A. § 1692k.
Whittiker v. Deutsche Bank Natl. Trust Co., 605 F.Supp.2d 914, 938-939 (N.D.Ohio 2009). “The absence of any one of the four essential elements is fatal to a FDCPA lawsuit.” Id. at 939.
*631 {¶ 10} A plaintiff does not need to demonstrate that he or she suffered actual damages in order to prevail on an FDCPA claim; the FDCPA “places the risk of penalties on the debt collector that engages in activities which are not entirely lawful, rather than exposing consumers to unlawful debt-collector behavior without a possibility for relief.” Stratton v. Portfolio Recovery Assocs., L.L.C., 770 F.3d 443, 449 (6th Cir.2014). Further, courts have characterized the FDCPA as a strict-liability statute, Fed. Home Loan Mtge. Corp. v. Lamar, 503 F.3d 504, 513 (6th Cir.2007); to establish liability, a plaintiff does not have to prove knowledge or intent of the debt collector, Wise, 780 F.3d at 713.
{¶ 11} Who is potentially liable under the FDCPA? The FDCPA excludes first-party creditors engaged in debt collection, but the statute broadly reaches the actions of “debt collectors,” an inclusive statutory term that covers third-party debt collectors as well as attorneys who regularly- engage in debt-collection activities, including litigation to collect debts owed by consumers. See 15 U.S.C. 1692a(6); Heintz v. Jenkins, 514 U.S. 291, 293-294, 297-299, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). In fact, in response “to the explosion of law firms conducting debt collection businesses,” Congress in 1986 specifically repealed a prior version of the FDCPA that had afforded attorneys an exemption from the statute’s reach. Hemmingsen v. Messerli & Kramer, P.A., 674 F.3d 814, 817 (8th Cir.2012); see McCollough v. Johnson, Rodenburg & Lauinger, L.L.C., 637 F.3d 939, 951 (9th Cir.2011).

The OCSPA

{¶ 12} As we hold later in this opinion, the OCSPA also provides protections for consumer debtors against debt collectors and their attorneys. The act states that “[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction.” R.C. 1345.02(A). R.C. 1345.03(A) provides that “[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction.” State and federal courts in Ohio have held that the OCSPA applies to debt collectors and to litigation activities. See, e.g., Hartman v. Asset Acceptance Corp., 467 F.Supp.2d 769, 780 (S.D.Ohio 2004), and cases cited therein. We confirm the validity of those precedents today.
FACTUAL AND PROCEDURAL HISTORY
{¶ 13} Sandra J. Taylor Jarvis[1] obtained a credit card and used it to make purchases over several years, but she was eventually unable to make scheduled *632 minimum payments on the account, and the account was declared delinquent. Taylor Jarvis’s debt was purchased and resold and eventually became owned by appellant First Resolution Investment Corporation (“FRIC”), a subsidiary of a Canadian corporation, appellant First Resolution Management Corporation (“FRMC”). FRIC had incomplete documentation of the terms of the credit-card agreement. Despite the centrality of the credit-card agreement to the parties’ positions in this litigation, no party has been able to produce it, and it is not in the record before us.
{¶ 14} The case before us proceeded like many others. FRIC hired appellants Cheek Law Offices, L.L.C., and Parri Hockenberry, Esq. (collectively “Cheek”) to file a lawsuit to collect on the debt. Cheek filed a complaint on March 9, 2010, and filed a motion for default judgment less than two months later. Within a week of the filing of that motion, FRIC had a signed entry from the trial judge granting it a default judgment, awarding it everything that it had asked for. Like clockwork, this case started out as a typical case in the world of debt buying.
{¶ 15} But Taylor Jarvis was different from most defendants who are sued in this way. She found out about the judgment against her and decided to fight it. Six weeks after the entry of the default judgment, she successfully moved to vacate it, and she later raised counterclaims against FRIC and Cheek. By doing so, she has given this court the opportunity to address issues in her case that happen to be endemic to the whole debt-collection world and that impact Ohio courts. Those issues include how to determine the proper statute of limitations in debt-collection cases and whether the filing of lawsuits containing unsubstantiated claims can constitute violations of the FDCPA and the OCSPA.
The Credit-Card Account and the Collection Action Against Taylor Jarvis

Offer and Acceptance

{¶ 16} Taylor Jarvis was a resident and domiciliary of Summit County. In 2001, Taylor Jarvis was solicited with a credit-card application in Ohio, completed that application in Ohio, and mailed it from Ohio to the issuing bank in Delaware, where it was approved. After her application was approved, Taylor Jarvis began using the credit card. The issuing bank eventually became, through acquisitions, Chase Bank USA, N.A. Although Taylor Jarvis’s credit-card account was with banks with three different names over the years, it was always the same account, and we collectively refer to the banks as “Chase.” There is no evidence that she used the card for anything other than making purchases for personal, household, and family use.

*633
Account History

{¶ 17} Taylor Jarvis made payments on the account through at least part of 2004 and mailed those payments to an address in the state of Delaware; one invoice in the record with a payment-due date of February 3, 2004, requested that payment be made to an address in Illinois, but Taylor Jarvis stated in an affidavit that she mailed all payments to Delaware, and there is no evidence in the record that contradicts that statement. She last used the card for a purchase on May 5, 2004. She then fell into arrears.
{¶ 18} Taylor Jarvis did not make the scheduled minimum payment on the account that was due on January 1, 2005, and made no scheduled minimum monthly payments thereafter. Her account was declared delinquent by Chase in February 2005. Subsequent credit-card billing statements during 2005 informed Taylor Jarvis that her account was past due and warned her that she could lose charging privileges on the account unless payment was made. Chase’s billing statement to Taylor Jarvis for the payment due on May 2, 2005, which covered the billing period from March 8 through April 7, stated, “Your charge privileges are now revoked.” By January 31, 2006, Chase had “written off’ Taylor Jarvis’s account.
{¶ 19} After suspending her charging privileges, Chase continued to send Taylor Jarvis bills, including one requesting payment by February 1, 2006. That bill showed a past-due amount of $1,481, a minimum payment due of $1,707, and a balance of $9,065.37. That bill also showed that Taylor Jarvis was making payments on the account, albeit in amounts less than the minimum due. Taylor Jarvis made her last payment to Chase on the account, for $50, on June 28, 2006. She had made a total of $1,150 in payments after the suspension of her charging privileges.
{¶ 20} In February 2008, Chase sold its rights to Taylor Jarvis’s account to Unifund Portfolio A, L.L.C. (“Unifund”). In June 2008, Unifund sold those rights to FRIC.
{¶ 21} On September 16, 2009, FRIC, through FRMC, sent a “final notice” to Taylor Jarvis. That notice advised Taylor Jarvis that her account had been forwarded to a “pre-litigation department” and that unless the account was resolved within 21 days, FRIC would forward the claim to a collection attorney.

Litigation

{¶ 22} On November 3, 2009, Cheek Law Offices sent Taylor Jarvis a letter informing her that FRIC had advised Cheek that Taylor Jarvis owed $15,818.50 on the account. Four months later, on March 9, 2010, Cheek filed suit against Taylor Jarvis in Summit County Common Pleas Court seeking $8,765.37 on the account, accrued interest of $7,738.99, and future interest of 24 percent. FRIC *634 attached to its complaint copies of the bills of sale of the rights to the account from Chase to Unifund and from Unifund to FRIC, as well as a copy of one of the monthly billing statements that Chase had sent to Taylor Jarvis in 2006. The attached statement showed that Taylor Jarvis was being charged interest on the unpaid balance on the account at the rate of 24.99 percent. FRIC did not attach to the complaint a copy of the credit-card agreement between Taylor Jarvis and Chase.
{¶ 23} Cheek filed a motion for default judgment on May 5, 2010, with an accompanying affidavit from a FRIC employee, claiming that Taylor Jarvis owed $8,765.37, accrued interest in the amount of $8,067.51, and continuing further interest at the rate of 24 percent. By May 12, 2010, FRIC had a signed entry from the trial judge granting it a default judgment, awarding it everything that it had asked for.
Taylor Jarvis’s Counterclaims
{¶ 24} On June 28, 2010, Taylor Jarvis filed a motion to vacate the judgment, and on July 26, 2010, the court granted the motion. On August 6, 2010, Taylor Jarvis answered the original complaint, raising several affirmative defenses, including a statute-of-limitations defense, and filed a number of class-action counterclaims; her amended version of the counterclaims, filed on August 26, 2010, included claims against FRIC, FRMC, and Cheek. Those claims were based on alleged violations of the FDCPA and the OCSPA, along with a common-law claim for abuse of process.
{¶ 25} Taylor Jarvis’s statutory claims flow from two theories — first, that FRIC’s claim against Taylor Jarvis was time-barred by the statute of limitations and second, that FRIC sought interest on Taylor Jarvis’s debt that was unavailable to FRIC by law. Taylor Jarvis alleged that threatening to file a time-barred claim and actually filing a time-barred claim against her constituted misleading and deceptive collection practices under 15 U.S.C. 1692e and the OCSPA and unfair and unconscionable collection practices under 15 U.S.C. 1692f and the OCSPA. Central to Taylor Jarvis’s statute-of-limitations-based claims is the position that FRIC’s claims against her accrued in Delaware and are thus governed by Delaware’s statute of limitations through operation of Ohio’s borrowing statute, R.C. 2305.03(B). According to Taylor Jarvis, because Delaware law affords only a three-year statute of limitations for actions to collect on debts, Del.Code Ann., Title 10, 8106(a), FRIC and Cheek knowingly brought an action that was barred by the statute of limitations, thereby violating state consumer-protection and federal fair-collection-practice laws.
{¶ 26} Taylor Jarvis also asserts that FRIC and Cheek improperly sought 24 percent interest on her debt in the complaint against her, purportedly under the terms of the cardholder agreement. Taylor Jarvis asserted that since FRIC could *635 produce no written contract that set forth a rate of interest higher than the statutory rate, it was limited to the statutory interest rate — 4 percent at the time of the filing of the complaint — pursuant to R.C. 1343.03. She further asserted that the actions of FRIC and Cheek in seeking in the complaint more interest than was recoverable constituted violations of 15 U.S.C. 1692e and 1692f as well as the OCSPA.

The Trial Court’s Rulings

{¶ 27} After FRIC dismissed without prejudice its complaint against Taylor Jarvis pursuant to Civ.R. 41(A), the trial court realigned the parties so that Taylor Jarvis was the plaintiff. On cross-motions for summary judgment, the trial court then entered judgment for Cheek and FRIC on Taylor Jarvis’s claims.
{¶ 28} As the trial court noted, Taylor Jarvis’s case turned, “in large part, on whether Ohio’s borrowing statute applies to the facts of this case.” It stated:
If the Court determines that Ohio’s borrowing statute applies to this case, the next question is whether [FRIC’s] claims accrued in Ohio or Delaware. If the Court determines that the claims accrued in Delaware, then they may be barred by Delaware’s three-year statute of limitations.
{¶ 29} The trial court held that the borrowing statute did not apply, that Ohio law governed the determination of the statute of limitations, that Ohio law imposed either a 6- or 15-year statute of limitations, and that under either limitation period FRIC’s suit against Taylor Jarvis was commenced timely because it was brought within six years of Taylor Jarvis’s breach.
{¶ 30} The court also ruled that Taylor Jarvis failed to show that FRIC and Cheek violated the FDCPA or the OCSPA by requesting in a complaint post-judgment interest in excess of the statutory rate. The court reasoned that a prayer for relief in a complaint is not a demand to the debtor but is rather a request for consideration to a court. Finally, the trial court also granted summary judgment to FRIC and Cheek on Taylor Jarvis’s common-law abuse-of-process claim.

The Court of Appeals Reverses and Remands

{¶ 31} On appeal, the Ninth District Court of Appeals reversed, holding that Delaware’s statute of limitations applied to FRIC’s claims. 2012-Ohio-5653, 983 N.E.2d 380, ¶ 29, 35-36 (9th Dist.). The appellate court further held that FRIC’s suit to collect on the debt was time-barred and remanded the matter to the trial court for consideration of Taylor Jarvis’s claims. Id. at ¶ 36, 42.
*636 {¶ 32} The court also reversed the trial court’s ruling on Taylor Jarvis’s claims based upon the interest rate sought by FRIC. The court held that FRIC in its complaint was “enunciating its absolute entitlement to interest at a rate of 24 percent and * * * was demanding such from Ms. Jarvis, not from the trial court,” and that Taylor Jarvis had established prima facie claims against FRIC and Cheek under the FDCPA and the OCSPA. Id. at ¶ 41. The court remanded the issue regarding the rate of interest sought to the trial court to consider whether the bona-fide-error defense of 15 U.S.C. 1692k(c) applied:
Because the trial court found that a prayer in a complaint for interest was not a demand to the debtor, it did not consider whether genuine issues of material fact existed regarding the existence of a bona fide error defense. This Court declines to address that issue in the first instance.
Id. at ¶ 42. Under 15 U.S.C. 1692k(c), a debt collector can escape liability by showing “by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.”
{¶ 33} The cause is before this court upon the acceptance of a discretionary appeal. 135 Ohio St.3d 1412, 2013-Ohio-1622, 986 N.E.2d 29.
LAW AND ANALYSIS
The Statute of Limitations
{¶ 34} Statutes of limitations are designed to protect defendants from stale claims, but for many consumers, they do not. In most states, the expiration of the statute of limitations does not automatically extinguish a debt and is instead
an affirmative defense that consumers themselves must raise and prove before courts will dismiss actions to collect on their debts. As the [Federal Trade] Commission has noted, because 90% or more of consumers sued in these actions do not appear in court to defend, filing these actions creates a risk that consumers will be subject to a default judgment on a time-barred debt.
Structure and Practices at 45.
{¶ 35} The filing of a time-barred lawsuit by a debt collector has been held to constitute a violation of 15 U.S.C. 1692e and 1692f for falsely representing the legal status of a debt and employing an unfair means to attempt to collect a debt. Phillips v. Asset Acceptance, L.L.C., 736 F.3d 1076, 1079 (7th Cir.2013); Dudek v. *637 Thomas & Thomas Attorneys & Counselors at Law, L.L.C., 702 F.Supp.2d 826, 833 (N.D.Ohio 2010). The court in Suesz v. Med-1 Solutions, L.L.C., 757 F.3d 636, 639 (7th Cir.2014) (en banc) described the too-common scenario: “[T]he debt collector hopes that the debtor will be unaware that he has a complete defense to the suit and so will default, which will enable the debt collector to garnish the debtor’s wages.”
{¶ 36} Thus, determining the correct statute of limitations on the underlying collection action is essential to this case and others like it. The appellate court below applied this court’s decision in Gries Sports Ents., Inc. v. Modell, 15 Ohio St.3d 284, 473 N.E.2d 807 (1984), and 1 Restatement of the Law 2d, Conflict of Laws, Section 188 (1971), to the conflict-of-laws question in this case. 2012-Ohio-5653, 983 N.E.2d 380, at ¶ 24. That conclusion was correct insofar as this case may implicate questions as to the applicable substantive law regarding the credit-card agreement. But the salient question is whether the statute of limitations, which is governed by procedural law, had run. “[Limitation provisions are remedial in nature, and are therefore controlled by the law of the forum.” Howard v. Allen, 30 Ohio St.2d 130, 133, 283 N.E.2d 167 (1972). As this court stated in Kerper v. Wood, 48 Ohio St. 613, 622, 29 N.E. 501 (1891): “Statutes of limitations relate to the remedy, and are, and must be, governed by the law of the forum; for it is conceded that a court which has power to say when its doors shall be opened has also power to say when they shall be closed.”
{¶ 37} Since Ohio is the forum state of this case, Ohio law determines the statute of limitations. But Ohio has a borrowing statute, which is a legislative exception to the general rule that a forum state always applies its own statute-of-limitations law. Combs v. Internatl. Ins. Co., 354 F.3d 568, 578 (6th Cir.2004). In essence, a borrowing statute directs a forum court to “borrow” the limitation period of another state .if the cause of action accrued in that foreign state and that state’s limitation period is shorter than the forum state’s limitation period. Dudek at 835, citing Combs at 578, and CMACO Automotive Sys., Inc. v. Wanxiang Am. Corp., 589 F.3d 235, 244 (6th Cir.2009). Pursuant to its borrowing statute, R.C. 2305.03(B), Ohio applies the statute of limitations of the state where the cause of action accrued in instances when that state’s statute of limitations is shorter. R.C. 2305.03(B) provides:
No civil action that is based upon a cause of action that accrued in any other state, territory, district, or foreign jurisdiction may be commenced and maintained in this state if the period of limitation that applies to that action under the laws of that other state, territory, district, or foreign jurisdiction has expired or the period of limitation that applies to that action under the laws of this state has expired.
*638 {¶ 38} As the trial court held, the key issue in determining the applicable statute of limitations in this case is the effect of R.C. 2305.03(B). That statute determines whethér the statute of limitations of Ohio — Taylor Jarvis’s home — or Delaware — where Chase is headquartered and where Taylor Jarvis stated in her affidavit that she mailed her signed credit-card agreement and sent all of her payments — is applicable in this case.
{¶ 39} The borrowing statute prevents a litigant from gaining the benefit of an Ohio statute of limitations when the state where the cause accrued has a shorter statute of limitations. As the United States Supreme Court wrote about Ohio’s earlier, similar version of the borrowing statute that was later repealed, “The purpose of the state’s borrowing statute as those of other states, was apparently to require its courts to bar suits against an Ohio resident if the right to sue him had already expired in another state where the combination of circumstances giving rise to the right to sue had taken place.” (Footnotes omitted.) Cope v. Anderson, 331 U.S. 461, 466, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947).
{¶ 40} There is no dispute that as applicable to this case, Ohio law provided that the statute of limitations for suit on a written contract was 15 years. Former R.C. 2305.06, Am.Sub.H.B. No. 152, 145 Ohio Laws, Part II, 3311, 3569. The statute of limitations for suit on a contract not reduced to writing is six years. R.C. 2305.07. In this case, the parties failed to enter the written credit-card agreement into evidence. Accordingly, absent the borrowing statute, the applicable limitation period for FRIC’s suit would be supplied by R.C. 2305.07, which limits the viability of any action to six years after the cause of action accrued.
{¶ 41} But if the borrowing statute is applicable to this case, Delaware’s shorter, three-year statute of limitations on contract actions applied to the collection action, rather than Ohio’s six-year statute of limitations.

The Jurisdiction of Accrual

{¶ 42} Where the cause of action accrued is the key element of the borrowing statute. Thus, we must determine where the underlying collection claims accrued in this case. The most relevant precedent favors the conclusion that the cause of action accrued in Delaware, which is where the debt was to be paid and where Chase suffered its loss.
{¶ 43} In Meekison v. Groschner, 153 Ohio St. 301, 306-307, 91 N.E.2d 680 (1950), this court addressed the question of where a cause of action accrued on a promissory note that had been executed in Michigan but that required the promisor to pay off the note in Napoleon, Ohio. This court considered whether Ohio’s borrowing statute in place at that time (which was very similar to current *639 R.C. 2305.03(B)) required that the cause of action on the unpaid note should be subject to Michigan’s statute of limitations or Ohio’s. This court concluded that the claim arose not where the contract was executed — Michigan—but where the contract was made payable — Ohio:
Where was that default? The Heaths were obligated to pay the note at Napoleon, Ohio. If it was not paid at Napoleon on its due date, a default would occur at Napoleon and a cause of action would arise for the first time because of the default at Napoleon. It seems to us unassailable that the cause of action arose where the default occurred, and therefore the Ohio statute * * * governs the instant case and an action on the note must be brought within 15 years after the cause thereof accrued.
Id. at 307. The Heaths were residing in Michigan when they made the decision to not pay the note. Thus, where they were when they made the decision to not pay the note played no role in this court’s determination of where the cause of action accrued.
{¶ 44} In a case directly on point, involving a suit based on a New York resident’s default on a credit card issued by a Delaware bank, New York’s highest court held that New York’s borrowing statute required an application of Delaware’s statute of limitations, because the cause of action for nonpayment accrued in Delaware. The court held that “[i]f the claimed injury is an economic one, the cause of action typically accrues ‘where the plaintiff resides and sustains the economic impact of the loss.’ ” Portfolio Recovery Assocs., L.L.C. v. King, 14 N.Y.3d 410, 416, 901 N.Y.S.2d 575, 927 N.E.2d 1059 (2010), quoting Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999). Since the bank was located in Delaware, that state’s statute of limitations applied.
{¶ 45} In Hamid v. Stock & Grimes, L.L.P., E.D.Pa. No. 11-2349, 2011 WL 3803792 (Aug. 26, 2011), the court determined that Pennsylvania’s borrowing statute required an application of Delaware’s statute of limitations because the cause of action for nonpayment on a credit card accrued in Delaware, where the bank failed to receive payment:
Here, the damage to Discover Bank occurred when it did not receive the payment due on August 12, 2006 at its post office box in Dover, Delaware. While Hamid’s failure to mail her payment may have set events in motion, it was in Delaware where the final significant event took place, that is, where Discover Bank sustained injury from non-payment of Hamid’s debt. It was not until Discover Bank failed to receive Hamid’s check on August *640 12, 2006 that it was able to sue her for breach of contract. We conclude that the place where the claim in the underlying action accrued was in Delaware.
Id. at *2.
{¶ 46} In another case directly on point, Conway v. Portfolio Recovery Assocs., L.L.C., 13 F.Supp.3d 711 (E.D.Ky.2014), the court, in applying Kentucky’s borrowing statute, held that the credit-card issuer’s breach-of-contract claim against a Kentucky-resident cardholder accrued in Virginia, the location where the bank, Capital One, should have received payment. The court sought to identify where “ ‘the injurious consequences of the alleged wrongful conduct occurred.’ ” Id. at 718, quoting Abel v. Austin, 411 S.W.3d 728, 737 (Ky.2013).
{¶ 47} The court pointed out the impracticality of using the location where the cardholder made the decision to not make his payment as the place of the accrual of the action:
Presumably, Capital One has similar agreements with multiple customers in multiple locations, but receives payments from those customers at one central location. It would be impossible for Capital One to know where any of those customers happen to be when they decide not to pay. Rather, as a practical matter, the only way Capital One can determine a customer is in default is when payment is not received at the central location in Virginia by a certain date.
(Emphasis sic.) Id. at 720-721. The court concluded that “[bjecause the due date passing without payment being received was the final event that allowed Capital One’s cause of action to accrue, and was also the event that actually resulted in damages to Capital One, the breach must have occurred when and where payment was not received, which in this case was Virginia.” Id. at 719.
{¶ 48} We follow our own precedent and that of New York’s highest court and the cited federal courts and hold that the cause of action against Taylor Jarvis for her failure to pay the debt accrued in the jurisdiction where the debt was to be paid, Delaware.

The Time of Accrual

{¶ 49} The time of accrual of the cause of action on Taylor Jarvis’s debt is an important consideration in this case not only to determine from what point the statute of limitations begins to run: FRIC and Cheek argue that the cause of action on the debt accrued before the effective date of R.C. 2305.03(B), so that even if Chase’s cause of action accrued in Delaware, Ohio’s borrowing statute is *641 inapplicable. The effective date of R.C. 2305.03(B) was April 7, 2005. Am.Sub. S.B. No. 80, 150 Ohio Laws, Part V, 7915, 7930-7931, 8037. The trial court apparently accepted the arguments of FRIC and Cheek that Chase’s claims accrued when Taylor Jarvis failed to make the minimum monthly payment in January 2005, and it found that since Chase’s claims accrued prior to the effective date of the statute, the borrowing statute could not apply. We agree that the cause of action accrued when Taylor Jarvis failed to make her minimum payment in January 2005, but we determine that R.C. 2305.03(B) nonetheless applies to the cause of action against her.
{¶ 50} Although there is no credit-card agreement in evidence in this case, Taylor Jarvis has not disputed that a contract existed between her and Chase. “Credit card agreements are contracts whereby the issuance and use of a credit card creates a legally binding agreement.” Bank One, Columbus, N.A. v. Palmer, 63 Ohio App.3d 491, 493, 579 N.E.2d 284 (10th Dist.1989). There is no dispute that a precursor of Chase issued a credit card to Taylor Jarvis and that she used the card to make purchases. A cause of action for breach of a credit-card agreement based on nonpayment accrues when the obligation to pay under the agreement becomes due and owing and the cardholder does not make an agreed-to monthly payment. Dudek, 702 F.Supp.2d at 839; Citibank, N.A. v. Hyslop, 10th Dist. Franklin No. 12AP-885, 2014-Ohio-844, 2014 WL 890942, ¶ 16-17; Discover Bank v. Heinz, 10th Dist. Franklin No. 08AP-1001, 2009-Ohio-2850, 2009 WL 1682004, ¶ 17; Discover Bank v. Poling, 10th Dist. Franklin No. 04AP-1117, 2005-Ohio-1543, 2005 WL 737404, ¶ 18.
{¶ 51} Taylor Jarvis also has not disputed that under her contract she was bound to make a minimum monthly payment. Nor has she disputed that she failed to make the minimum payment due on January 1, 2005, and failed to make a minimum payment thereafter. We have already held that the cause of action accrued in Delaware, where Chase Bank did not receive payment from Taylor Jarvis. The location of accrual informs the time of the accrual:
[T]he elements of time and place of accrual are inextricably intertwined: “The time when a cause of action arises and the place where it arises are necessarily connected, since the same act is the critical event in each instance. The final act which transforms the liability into a cause of action necessarily has both aspects of time and place.”
CMACO Automotive Sys., 589 F.3d at 243, fn. 7, quoting Helmers v. Anderson, 156 F.2d 47, 51 (6th Cir.1946).
{¶ 52} We determine that the cause of action accrued when Taylor Jarvis failed to make the minimum payment due in January 2005.
*642 {¶ 53} But this finding does not make Ohio’s borrowing statute inapplicable in this case. It is true that Article II, Section 28 of the Ohio Constitution prohibits the General Assembly from enacting retroactive laws. But there is no indication that the General Assembly intended R.C. 2305.03(B) to be retroactive — it is written to apply prospectively to all cases commenced after its effective date. The statute reads:
No civil action that is based upon a cause of action that accrued in any other state * * * may be commenced and maintained in this state if the period of limitation that applies to that action under the laws of that other state * * * has expired or the period of limitation that applies to that action under the laws of this state has expired.
(Emphasis added.)
{¶ 54} R.C. 2305.03(B) applies to civil actions “commenced and maintained” in Ohio after the effective date of the statute. “Statutes of limitations are remedial in nature.” Flagstar Bank, F.S.B. v. Airline Union’s Mtge. Co., 128 Ohio St.3d 529, 2011-Ohio-1961, 947 N.E.2d 672, ¶ 7. And this court has held that “ ‘[l]aws of a remedial nature providing rules of practice, courses of procedure, or methods of review are applicable to any proceedings conducted after the adoption of such laws.’ ” Estate of Johnson v. Randall Smith, Inc., 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 20, quoting Kilbreath v. Rudy, 16 Ohio St.2d 70, 242 N.E.2d 658 (1968), paragraph two of the syllabus. Thus, as a remedial statute, the borrowing statute applies to proceedings conducted after its adoption.
{¶ 55} But what of the concern that R.C. 2305.03(B) potentially applies to causes of action that accrued but were not commenced before the effective date of the statute? This court has recognized that a statute that applies prospectively may, through its operation, violate the Retroactivity Clause if it destroys vested rights:
We have also stated that the “retroactivity clause nullifies those new laws that ‘reach back and create new burdens, new duties, new obligations, or new liabilities not existing at the time [the statute becomes effective].’ Miller v. Hixson (1901), 64 Ohio St. 39, 51, 59 N.E. 749, 752.” Bielat [v. Bielat], 87 Ohio St.3d [350,] 352-353, 721 N.E.2d 28 [2000], In Van Fossen [v. Babcock & Wilcox Co., 36 Ohio St.3d 100, 522 N.E.2d 489 (1988)], this court stated that the constitutional limitation against retroactive laws “ ‘include[s] a prohibition against laws which commenced on the date of enactment and which operated in futuro, but which, in doing so, divested rights, particularly property rights, which had been vested anteri- *643 or to the time of enactment of the laws.’ ” [Id. at 105], quoting Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence (1936), 20 Minn.L.Rev. 775, 781-782.
Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce, 127 Ohio St.3d 511, 2010-Ohio-6207, 941 N.E.2d 745, ¶ 14.
{¶ 56} The shortening of a statute of limitations, however, does not necessarily extinguish a vested right. This court has held that the shortening of a statute of limitations is constitutionally permissible when it does not destroy an existing cause of action. The continued vitality of the cause of action after the amendment of the statute is the crucial factor in the inquiry. This court has
delineated between the operation of an amended statute of limitations which totally obliterates an existing substantive right and one which merely shortens the period of time in which the remedy can be realized. The latter application of an amended statute is not unlawful as long as a prospective claimant or litigant * * * is still afforded “ ‘a reasonable time [within] which to enforce’ his right.” [Gregory v.] Flowers, [32 Ohio St.2d 48,] 54, [290 N.E.2d 181 (1972), quoting Smith v. New York Cent. RR. Co., 122 Ohio St. 45, 49, 170 N.E. 637 (1930)].
(Emphasis sic.) Cook v. Matvejs, 56 Ohio St.2d 234, 237, 383 N.E.2d 601 (1978).
{¶ 57} In sum, “ ‘[a] period of limitations already running may also be shortened by the legislature’ as long as ‘a period sufficiently long to allow a reasonable time to begin suit’ is allowed.” State ex rel. Nickoli v. Erie Metro-Parks, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, ¶ 29, quoting 1A Sackman, Nichols on Eminent Domain, Section 4.102[3], at 4-74 (3d Ed.2006).
{¶ 58} Here, the date of the accrual of the cause of action was only a little over three months before the effective date of the borrowing statute. Granted, the application of the borrowing statute to FRIC’s claims in this case reduces the applicable statute of limitations from six years to three. But even with that shortening, there existed a reasonably long period of time for FRIC to file suit. Thus, an application of R.C. 2305.03(B) in this case is not unconstitutionally retroactive.
{¶ 59} With Delaware’s statute of limitations controlling this case, FRIC’s complaint was filed well outside the applicable statute of limitations. We affirm the judgment of the court of appeals that FRIC and Cheek are potentially liable under the FDCPA and the OCSPA for threatening to file suit and for filing suit on a time-barred debt, and we remand the case to the trial court for further *644 determinations, including a determination of the effect of our holding on this issue on Taylor Jarvis’s claim for abuse of process.
The Interest Claim
{¶ 60} Taylor Jarvis asserted claims against FRIC and Cheek pursuant to the FDCPA and the OCSPA based on the claim in FRIC’s complaint that it was entitled to postjudgment interest in excess of the applicable statutory rate. The trial court granted summary judgment to FRIC and Cheek on the issue, relying primarily on the decision in Argentieri v. Fisher Landscapes, Inc., 15 F.Supp.2d 55 (D.Mass.1998), for the proposition that setting forth a claim in a prayer for relief filed with a court is distinguishable from other conduct in which a debt collector may engage.
{¶ 61} In Argentieri, the plaintiff in a federal-court action alleged an FDCPA violation based upon a request for attorney fees that had been made in a state-court complaint in a breach-of-contract action; the plaintiff asserted that the FDCPA was violated because there was no statutory or contractual basis for such an award. Id. at 58-59. According to Argentieri, a prayer for relief is just a request to the court:
A prayer for relief in a complaint, even where it specifies the quantity of attorney’s fees, is just that: a request to a third party — the court — for consideration, not a demand to the debtor himself. A request for attorney’s fees ultimately rests upon the discretion of the court and a determination of applicability at a later stage of the litigation. The whole purpose of regulating debt collection was to “supervise” a range of unsupervised contacts, such as demand letters and late-night telephone calls. In contrast, a statement in a pleading is supervised by the court and monitored by counsel. The two situations are drastically different.
(Footnote omitted.) Id. at 61-62.
{¶ 62} We disagree with that statement. A prayer for 24 percent interest is an intimidating statement to a debtor. According to Argentieri, such a prayer is “supervised by the court and monitored by counsel.” But in a case that is filed with the anticipation of obtaining a default judgment, how much “supervision” of statements in a pleading is actually conducted? In this case, as in many others, there was none. “Unsupervised contacts” by debt collectors are annoyances; demands to a court, on the other hand, have the force of the legal system behind them. Debt collectors borrow the legitimacy of the justice system to back up their claims. “[A] civil filing serves as a credible threat to inflict harm on the defendant” by damaging the defendant’s credit rating and thus “may induce the *645 defendant to pay.” Hynes, Broke But Not Bankrupt: Consumer Debt Collection in State Courts, 60 Fla.L.Rev. 1, 20 (2008). As one court put it,
an unsophisticated consumer reading the State Court Complaint could be left with the false impression that [the law firm that filed the complaint] was legally entitled to recover an award of attorneys’ fees in addition to the amount of the debt allegedly owed. This false impression, in turn, could subtly coerce the consumer to pay the debt out of the fear of incurring even greater liability.
Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, L.L.P., 112 F.Supp.3d 160, 164 (S.D.N.Y.2015).
{¶ 63} Federal courts have held that a court filing is not a safe harbor for debt collectors under the FDCPA. In Heintz, 514 U.S. at 294, 115 S.Ct. 1489, 131 L.Ed.2d 395, the United States Supreme Court held that the FDCPA “applies to the litigating activities of lawyers.” Relying on that holding, federal “circuit courts have widely recognized that litigation-related conduct, including the filing of formal complaints, can give rise to claims under the Act.” Lipscomb v. The Raddatz Law Firm, P.L.L.C., 109 F.Supp.3d 251, 260 (D.D.C.2015).
{¶ 64} In Kaymark v. Bank of Am., N.A., 783 F.3d 168, 177 (3d Cir.2015), the court held that “a communication cannot be uniquely exempted from the FDCPA because it is a formal pleading or, in particular, a complaint.” In that case, the consumer, Kaymark, had defaulted on a mortgage held by Bank of America (“BOA”). A law firm representing BOA initiated foreclosure proceedings against the consumer in state court. The foreclosure complaint included an itemized list of total debt, which included $1,650 in attorney fees that had not yet been incurred at the time of the filing and other allegedly improper fees. Id. at 173. Kaymark’s subsequent action against BOA and the law firm included a claim that by attempting to collect fees for legal services not yet performed in the mortgage foreclosure, the law firm had violated the FDCPA. Id. at 174. The court held that “the Foreclosure Complaint conceivably misrepresented the amount of the debt owed, forming a basis for violations of [15 U.S.C.] 1692e(2)(A) and (10)” and that Kaymark had also “sufficiently alleged that [the law firm’s] attempt to collect those misrepresented fees was not ‘expressly authorized’ by the mortgage contract or permitted by law,” forming the basis for a violation of 15 U.S.C. 1692f(1). Kaymark at 175, quoting 15 U.S.C. 1692f(1). In response to the law firm’s argument that pleadings cannot be the basis of FDCPA claims, the court concluded that “the statutory text, as well as the case law- interpreting that text, renders this argument meritless.” Id. at 176.
*646 {¶ 65} In Miljkovic v. Shafritz & Dinkin, P.A., 791 F.3d 1291 (11th Cir.2015), the court stated that “because debts are often collected through the judicial process, * * * we think it would ‘compel absurd results’ indeed if abusive, misleading, or unconscionable documents submitted to a court (and served on the consumer or his counsel) in an attempt to collect on any debt were excluded from the [FDCPAJ’s proscriptions.” Id. at 1303, fn. 8, quoting Jerman, 559 U.S. at 600, 130 S.Ct. 1605, 176 L.Ed.2d 519. The court in Miljkovic ultimately determined that the court filing at issue — a reply to the consumer’s claim of an exemption from a garnishment action — did not rise to the level of an FDCPA violation. Id. at 1306. But as to the broader question, the court stated,
The statutory text is entirely clear: the FDCPA applies to lawyers and law firms who regularly engage in debt-collection activity, even when that activity involves litigation, and categorically prohibits abusive conduct in the name of debt collection, even when the audience for such conduct is someone other than the consumer.
Id. at 1297.
{¶ 66} A recent decision of the Sixth Circuit Court of Appeals involved a scenario akin to the present case — the consumer’s FDCPA cause of action was based on a debt collector’s improper claim for interest on a credit-card debt. In Stratton v. Portfolio Recovery Assocs., 770 F.3d at 445, the court held that a debt collector’s improper claim for statutory interest made in a complaint filed in a state trial court could form the basis for a claim by the consumer under the FDCPA. In Stratton, the credit-card user, Stratton, had stopped making payments on her credit card; her contract with GE Money Bank (“GE”) established an interest rate of 21.99 percent. Id. at 446. Once GE determined that the debt was uncollectible, it stopped charging Stratton interest on the debt, for reasons that, according to the federal circuit court, were “neither irrational or altruistic: By charging off the debt and ceasing to charge interest on it, GE could take a bad-debt tax deduction * * * and could avoid the cost of sending Stratton periodic statements on her account.” Id. at 445. GE then sold the debt to Portfolio Recovery Associates, L.L.C. (“PRA”). Id.
{¶ 67} Two years after buying the debt, PRA filed suit against Stratton, alleging that she “ ‘owes [PRA] $2,630.95 with interest thereon at the rate of 8% per annum from December 19, 2008[,J until the date of judgment with 12% per annum thereafter until paid, plus court costs.’ ” (Brackets sic.) Id. at 446, quoting PRA’s complaint. Kentucky’s usury statute, Ky.Rev.Stat.Ann. *647 360.010(1), sets the legal rate of interest for all loans made in that state at 8 percent unless the parties agree in writing to a higher rate. Stratton at 445.
{¶ 68} Stratton filed a putative class action against PRA in federal court,
alleging that PRA’s attempt to collect 8% interest for the period between the date GE charged off Stratton’s debt and the date it sold that debt to PRA violated the FDCPA. In particular, Stratton alleged that the 8% interest was not “expressly authorized by the agreement creating the debt or permitted by law,” 15 U.S.C. § 1692f(1), that PRA had falsely represented the “character” of Stratton’s debt and the “amount” she owed, § 1692e(2)(A), and that PRA’s suit to recover interest it was not owed was a “threat” to take an “action that cannot legally be taken,” § 1692e(5).
Id. at 446.
{¶ 69} The district court dismissed Stratton’s case, concluding that “even an unsophisticated consumer would have understood that the request for interest was just a request, and would not have been misled by it.” Stratton v. Portfolio Recovery Assocs., L.L.C., E.D.Ky. No. 5:13-147-DCR, 2013 WL 6191804, *5 (Nov. 26, 2013). Further, the district court held that the state-court collection action did not constitute a threat, but was instead a “lawful vehicle” to recover Stratton’s debt. Id. at *7.
{¶ 70} The Sixth Circuit reversed, first establishing that the interest sought by PRA in its complaint was not authorized by law. The court found that the 8 percent statutory interest rate was unavailable to PRA because it was unavailable to GE due to the contract GE had negotiated with Stratton:
GE waived its right to collect contractual interest, a right it had acquired in part by forgoing its right to collect statutory interest. GE gave up the right to collect 8% statutory interest when it had Stratton agree to a 21.99% contractual rate of interest. GE cannot recover the right it bargained away simply because it later chose to waive the right for which it bargained.
Stratton, 770 F.3d at 448.
{¶ 71} In Stratton, the Sixth Circuit recognized that pursuing the unavailable 8 percent interest rate against the consumer could constitute an FDCPA violation. The court rejected the district court’s holding, which had relied on Argentieri:
*648 The district court distinguished “claims made in court from the type of abusive tactics most often invoked under the FDCPA” and saw “no need to invoke the protections” of the Act “when a claim is made to the court,” (quoting Argentieri v. Fisher Landscapes, Inc., 15 F.Supp.2d 55, 62 (D.Mass.1998)). Both Supreme Court precedent and the other traditional tools of statutory construction make clear that the district court’s understanding of the FDCPA is untenable.
(Footnote omitted.) Stratton at 449.
{¶ 72} First, the court noted that the United States Supreme Court recognized in Heintz that the FDCPA applies to the litigating activities of lawyers. Stratton at 449. Second, the court pointed out that the FDCPA from its inception “reflected Congressional concern with abusive litigation tactics” through the enactment of 15 U.S.C. 1692i, the FDCPA’s “fair venue” provision, which was designed to combat the problem of forum abuse — an unfair practice in which debt collectors seek to obtain default judgments by filing suit in courts so distant or inconvenient that consumers cannot make an appearance. Id. at 449-450. Third, the Stratton court recognized that post-Heintz amendments to 15 U.S.C. 1692e specifically exempt formal pleadings only “ ‘from a sole particularized requirement of the FDCPA: the requirement [in 15 U.S.C. 1692e(11)] that all communications state that they come from a debt collector.’ ” Stratton at 450, quoting Sayyed v. Wolpoff & Abramson, 485 F.3d 226, 231 (4th Cir.2007). Relying on the Fourth Circuit’s reasoning in Sayyed, the Stratton court determined that formal pleadings are subject to the other provisions of 15 U.S.C. 1692e:
As the Fourth Circuit explained, “[t]he amendment by its terms in fact suggests that all litigation activities, including formal pleadings are subject to the FDCPA, except to the limited extent that Congress exempted formal pleadings from the particular requirements of § 1692e(11).”
Stratton at 450, quoting Sayyed at 231. The Stratton court concluded, “In sum, absent strong evidence of an exemption, the FDCPA’s protections are available wherever unscrupulous debt collection practices might be found — and most certainly in litigation.” Id.
{¶ 73} Having determined that the filing of a complaint can constitute an FDCPA violation, the Stratton court employed the “least sophisticated consumer” test—“ ‘the usual objective legal standard in consumer protection cases’ ” — in considering PRA’s complaint. Id., quoting Gionis v. Javitch, Block & Rathbone, L.L.P., 238 Fed.Appx. 24, 28 (6th Cir.2007). The Stratton court held that “[a]s the drafter of the complaint, PRA ‘is responsible for its content and for what the *649 least sophisticated [consumer] would have understood from it.’ ” (Brackets sic.) Id. at 451, quoting McLaughlin v. Phelan Hallinan & Schmieg, L.L.P., 756 F.3d 240, 246 (3d Cir.2014).
{¶ 74} Pursuant to that standard, the court found that Stratton had alleged numerous plausible FDCPA violations:
Because PRA does not have the right to collect interest on Stratton’s debt, PRA’s allegation to the contrary is a “false representation” of the “character” and “amount” of Stratton’s debt. § 1692e(2); see also Gearing v. Check Brokerage Corp., 233 F.3d 469, 472 (7th Cir.2000). PRA’s state court suit is an “attempt” to collect an “amount”—$2,630.95 plus 8% interest — that is neither “expressly authorized” by any agreement in the record nor “permitted by law.” § 1692f(1). And from the perspective of the least sophisticated consumer it is also a “threat” by PRA “to take action that cannot legally be taken” — namely, to recover 8% interest.
Stratton, 770 F.3d at 451.
{¶ 75} The court in Stratton rejected the argument put forth by PRA that its request for statutory interest was merely an aspirational request to the state court, rather than a representation of the legal status of the debt. The court found it significant that PRA had not sought a'nonspecific, open-ended amount that the state court might have deemed appropriate, but rather, in the numbered allegations in the complaint had stated, “ ‘The Defendant(s) owes the plaintiff $2,630.95, with interest thereon at the rate of 8% per annum.’ ” (Emphasis added by the court.) Id. at 451, quoting the complaint. The court found that “even a sophisticated consumer would read that numbered paragraph from the complaint to be a factual allegation rather than an ‘aspirational request.’ ” Id. The court held:
Thus, PRA’s argument fails for two reasons: PRA’s allegation was not a “simple request” and there is no protection for a representation that is inaccurate. Saying that Stratton owed $2630.95 plus whatever interest the court chooses to award is simply not the same as saying that Stratton owed $2630.95 plus 8% interest from the date GE charged off her account. PRA averred the latter. It is therefore plausible that PRA’s complaint falsely represents both the “character” and “amount” of Stratton’s debt. An unsophisticated consumer would most certainly have been misled.

*650
Id.

{¶ 76} We agree with the overarching conclusion reached by the court in Stratton that both the text and purpose of the FDCPA as well as the reality of the debt-collection industry’s pursuit of default judgments as part of its typical collection strategy require the application of the FDCPA to abusive and unfair tactics employed in litigation:
The FDCPA governs debt collection in or out of court; it does not allow debt collectors to use litigation as a vehicle for abusive and unfair practices that the Act forbids. The district court’s [statement that there is “ ‘no need to invoke the protections’ ” of the FDCPA “ ‘when a claim is made to the court,’ ” (quoting Argentieri, 15 F.Supp.2d at 62)] conflicts with the text and purpose of the FDCPA and ignores the reality of the debt collection business, where “some debt collectors have foregone all meaningful attempts to communicate with debtors and have instead opted to file lawsuits against debtors en masse in an effort to collect enforceable default judgments.” Matthew R. Bremner, The Need for Reform in the Age of Financial Chaos, 76 Brook. L.Rev. 1553, 1587 (2011); see also Crawford v. LVNV Funding, LLC, 758 F.3d 1254, 1256 (11th Cir.2014). * * * By alleging in a complaint that a consumer owes interest that had in fact been waived, a debt collector may be able to secure a default judgment for an amount the consumer does not actually owe. See Suesz, 757 F.3d at 639. The FDCPA proscribes such practices.
Stratton at 451-452.
{¶ 77} Like the debt collector in Stratton, FRIC in its complaint sought an interest rate to which it was not entitled. A creditor is limited to interest at the statutory rate unless a written contract provides a different rate of interest, pursuant to R.C. 1343.03(A). Minster Farmers Coop. Exchange Co., Inc. v. Meyer, 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 25-27. “‘An invoice or monthly statement does not constitute such a writing.’ ” Id. at ¶ 27, quoting WC Milling, L.L.C. v. Grooms, 164 Ohio App.3d 45, 2005-Ohio-5420, 841 N.E.2d 324, ¶ 20 (4th Dist.), citing Yager Materials, Inc. v. Marietta Indus. Ents., Inc., 116 Ohio App.3d 233, 235-236, 687 N.E.2d 505 (4th Dist.1996). FRIC filed its complaint and motion for default judgment seeking an interest rate above the maximum statutory rate, but it attached only a billing statement to its complaint to support that rate of interest and did not attach a copy of the credit-card agreement that Taylor Jarvis had signed. Pursuant to R.C. 1343.03(A), when there is not a written contract the statutory rate is determined by a *651 formula set forth in R.C. 5703.47; in 2010, when the complaint was filed, that rate was 4 percent. See http://www.tax.ohio.gov/ohiomndividual/individuaVinterest_ rates.aspx.
{¶ 78} As in Stratton, the complaint against Taylor Jarvis here alleged that she was required to pay a specific rate of interest; FRIC did not simply request interest at a rate the trial court might deem appropriate. The request is set forth in paragraph three of the complaint:
Upon information and belief, Plaintiff is owed the charged off sum of $8,765.37, plus accrued interest of $7,738.99, for a total amount owed of $16,504.36, plus future interest at 24.00 % and Defendant(s) is/are in default of his/her/their obligation to pay said balance.
The specificity of the complaint belies the idea that FRIC’s claim of entitlement to 24 percent interest was merely an aspirational request to the court rather than a representation of the legal status of the debt.
{¶ 79} FRIC and Cheek rely on Harvey v. Great Seneca Fin. Corp., 453 F.3d 324, 333 (6th Cir.2006), in which the court held that filing a lawsuit to collect a purported debt without the immediate means of proving the existence of the debt does not constitute a violation of the FDCPA. In Harvey, the consumer had filed a responsive pleading to a state-court collection complaint and had sought discovery from the debt collector and its attorneys — culminating in the consumer filing a motion to compel — concerning the ownership and amount of the debt. The debt collector did not respond to discovery and dismissed its complaint. The consumer then filed suit in federal court, alleging that the debt collector and its law firm knew that they lacked documentation to prove the existence of the debt for which they filed a state-court collection action and that the filing of a complaint under those circumstances constituted a deceptive debt-collection practice. Id. at 326.
{¶ 80} In affirming the district court’s dismissal of the consumer’s complaint, the Sixth Circuit held that “a debt may be properly pursued in court, even if the debt collector does not yet possess adequate proof of its claim.” Id. at 333. The court in Harvey quoted the reasoning of a federal district court in a similar case:
“[F]iling a lawsuit supported by the client’s affidavit attesting to the existence and amount of a debt * * * is not a false representation about the character or legal status of a debt, nor is it unfair or unconscionable. A defendant in any lawsuit is entitled to request more information or details about a plaintiffs claim, either through formal pleadings challeng *652 ing a complaint, or through discovery. [The consumer] does not allege that anything in the state court complaint was false, or that the complaint was baseless. She essentially alleges that more of a paper trail should have been in the lawyers’ hands or attached to the complaint. The FDCPA imposes no such obligation.”
Id. at 331, quoting Deere v. Javitch, Block, & Rathbone, L.L.P., 413 F.Supp.2d 886, 891 (S.D.Ohio 2006).
{¶ 81} The court in Harvey pointed out that Harvey did not allege in her complaint that the debt collector and its law firm had failed to undertake a reasonable investigation into whether or not Harvey’s debt existed; rather, “she essentially focused on the contention” that the debt collector and law firm “did not presently possess the means of proving that debt” when the state-court complaint was filed. Id. at 333.
{¶ 82} Harvey is distinguishable for several reasons. First, the consumer in this case alleges more than the consumer alleged in Harvey. Taylor Jarvis’s pleading in this case alleged not only that FRIC and Cheek filed a lawsuit against her without possessing at the time of filing the means of proving the debt, but she also alleged that they regularly maintain lawsuits such as the one against her “without the intention or ability to ever obtain evidence” that would establish FRIC’s entitlement to interest in excess of the statutory rate. We agree with courts that have found that allegations of this type — regarding the lack of intent to investigate or prove claims on behalf of debt collectors — distinguish cases such as this one from Haney. See, e.g., Rollins v. Midland Funding, L.L.C., E.D.Mo. No. 4:14CV01976 ERW, 2015 WL 3506556, *8 (June 3, 2015), citing Hinten v. Midland Funding, L.L.C., E.D.Mo. No. 2:13CV54 DDN, 2013 WL 5739035, *7 (Oct. 22, 2013), and Brewer v. LVNV Funding, L.L.C., E.D.Mo. No. 4:14CV00942 AGF, 2014 WL 5420274, *2 (Oct. 22, 2014).
{¶ 83} Further, FRIC here went far beyond simply filing a complaint without yet having “adequate proof of its claim.” Harvey, 453 F.3d at 333. FRIC filed its complaint in March 2010, without including a copy of the credit-card agreement. It quickly sought a default judgment. It did not retreat from the claim for 24 percent interest for which it lacked adequate documentation when it moved for default judgment; instead, it attached an affidavit from a FRIC employee to the motion for default judgment asserting that FRIC was owed “interest at the rate of at least” 24 percent. About two months after filing the complaint, it had a judgment entry awarding it 24 percent postjudgment interest. But it never had the necessary documentation to back up its claim. This was not a mere lack of proof at the first instance of filing. It was a demand for 24 percent interest— *653 unavailable under the law — from a debtor whom it thought would never fight back.
{¶ 84} Finally, FRIC lacked more than just a paper trail. FRIC in this case attempted to collect an interest rate that it could not legally collect; only a written contract could except FRIC from the statutory rate of interest under R.C. 1343.03(A). The existence of a written contract setting forth the interest rate is an essential element of its claim.
{¶ 85} There is a clear difference between asserting claims that are recoverable under the law and those that are not. In Foster v. D.B.S. Collection Agency, 463 F.Supp.2d 783, 802 (S.D.Ohio 2006), the court found a violation of the FDCPA when a creditor prayed for attorney fees that were unobtainable pursuant to an Ohio statute. The Foster court reasoned that “from the perspective of the ‘least sophisticated consumer,’ ” the prayer for such relief “constitute^] an absolute entitlement to attorney fees, even though such fees are not recoverable under Ohio law.” Id.
{¶ 86} In this case, from the perspective of the least sophisticated consumer, the prayer for relief claimed entitlement to a rate of interest that was unavailable under the law to FRIC. We affirm the appellate court’s decision that Taylor Jarvis established a prima facie case against FRIC and Cheek under the FDCPA and the OCSPA on this issue.
Liability Under the OCSPA
{¶ 87} The court below did not address head-on the question of the applicability of the OCSPA to debt collectors and their attorneys, but instead simply held that Taylor Jarvis had presented viable claims under both the FDCPA and the OCSPA. FRIC and Cheek rely on definitions in R.C. 1345.01(C) and 1345.01(A) to assert that the OCSPA “does not apply to bank assignees and their collection attorneys because there is no ‘consumer transaction’ or ‘supplier.’ ” We reject their arguments in this regard and agree with Taylor Jarvis’s position that debt collectors, including attorneys engaged in debt collections, can be held liable under the OCSPA.
{¶ 88} Both the FDCPA and the OCSPA are remedial statutes, intended to reach a broad range of conduct. To state a claim under the FDCPA, a debtor must establish that a party violated one of the substantive provisions of the act while engaging in debt-collection activity. Glazer v. Chase Home Fin., L.L.C., 704 F.3d 453, 459-460 (6th Cir.2013). 15 U.S.C. 1692e forbids “false, deceptive, or misleading representation^] or means in connection with the collection of any debt.” 15 U.S.C. 1692e(2)(A) prohibits a party from making a “false representation” of the “amount” of any debt. And 15 U.S.C. 1692e(10) prohibits a party from using “false representation or deceptive means to collect or attempt to collect any *654 debt or to obtain information concerning a consumer.” For a statement to be actionable, however, it must be “more than just misleading — it ‘must be materially false or misleading to violate Section 1692e.’ ” (Emphasis sic.) Clark v. Lender Processing Servs., 562 Fed.Appx. 460, 466 (6th Cir.2014), quoting Wallace v. Washington Mut. Bank, F.A., 683 F.3d 323, 326 (6th Cir.2012). “The materiality-standard * * * means that in addition to being technically false, a statement would tend to mislead or confuse the reasonable unsophisticated consumer.” Id., citing Wallace at 326-327.
{¶ 89} The OCSPA is similar:
[R.C.] Section 1345.02(A) provides that “[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.” Section 1345.03(A) provides that “[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.” Although the OCSPA does not expressly address debt collection practices, Ohio courts have applied the OCSPA to such practices. See Liggins v. May Co., 44 Ohio Misc. 81, 337 N.E.2d 816 (Ohio C.P. Cuyahoga County 1975).
Lewis v. ACB Business Servs., Inc., 135 F.3d 389, 403 (6th Cir.1998), fn. 11.
{¶ 90} The interrelationship between the FDCPA and the OCSPA is established:
“[Vjarious violations of the FDCPA constitute a violation of the CSPA. * * * [T]he purpose of both acts is to prohibit both unfair and deceptive acts and this court holds that any violation of any one of the enumerated sections of the FDCPA is necessarily an unfair and deceptive act or practice in violation of R.C. § 1345.02 and/or § 1345.03.”
Kelly v. Montgomery Lynch & Assocs., Inc., N.D.Ohio No. 1:07-CV-919, 2008 WL 1775251, *11 (Apr. 15, 2008), quoting Becker v. Montgomery, Lynch, N.D.Ohio No. Civ.A. 1:02CV 874, 2003 WL 23335929, *2 (Feb. 26, 2003). But see Slorp v. Lerner, Sampson & Rothfuss, 587 Fed.Appx. 249, 260-261 (6th Cir.2014) (cautioning that some conduct that violates the FDCPA may not necessarily constitute a violation of the OCSPA). Thus, it is helpful to further examine the *655 FDCPA as we consider the application of the OCSPA in the context of debt collection by debt buyers and attorneys.
{¶ 91} Under the FDCPA, a debt collector is “any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.” 15 U.S.C. 1692a(6). And in Heintz v. Jenkins, 514 U.S. at 299, 115 S.Ct. 1489, 131 L.Ed.2d 395, the United States Supreme Court made clear that the FDCPA applies to “attorneys who ‘regularly’ engage in consumer-debt-collection activity, even when that activity consists of litigation.” See also Beler v. Blatt, Hasenmiller, Leibsker & Moore, L.L.C., 480 F.3d 470, 472 (7th Cir.2007).
{¶ 92} Typically, to determine the applicability of the FDCPA to a particular attorney or law firm, the salient question is whether the attorney or law firm regularly engages in consumer-debt-collection activity within the meaning of the act. In answering that question, the focus is on the “regularity” of the collection activities by the attorney and his or her firm.
{¶ 93} As the Sixth Circuit recognizes, “[ojrdinary interpretations of the words ‘regular’ and ‘regularly’ fail to delineate the amount of debt collection activity required * * * to find an attorney a ‘debt collector’ under the FDCPA.” Schroyer v. Frankel, 197 F.3d 1170, 1174 (6th Cir.1999). The Sixth Circuit holds that “for a court to find that an attorney or law firm ‘regularly’ collects debts for purposes of the FDCPA, a plaintiff must show that the attorney or law firm collects debts as a matter of course for its clients or for some clients, or collects debts as a substantial, but not principal, part of his or its general law practice.” Id. at 1176.
{¶ 94} Despite the Supreme Court’s holding in Heintz and other reported precedent that makes clear that the FDCPA applies to lawyers and law firms who regularly engage in debt collection as well as to other debt collector Cheek and FRIC assert that they are not subject to liability under the OCSPA because they are not “suppliers” within the meaning of R.C. 1345.01(C) and because no “consumer transaction” within the meaning of R.C. 1345.01(A) occurred.
{¶ 95} We have little trouble concluding that Cheek and FRIC are “suppliers.” As we explained in Anderson v. Barclay’s Capital Real Estate, Inc., 136 Ohio St.3d 31, 2013-Ohio-1933, 989 N.E.2d 997:
“ ‘Supplier’ means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer.” R.C. *656 1345.01(C). The terms “effecting” and “soliciting” are not defined by the statute, so we give the terms their plain and ordinary meanings.
“Effect” is defined as “[t]o bring about; to make happen.” Black’s Law Dictionary at 592 [9th Ed.2009]. “Solicitation” is defined as “[t]he act or an instance of requesting or seeking to obtain something; a request or petition.” Black’s at 1520.
Id. at ¶ 29-30.
{¶ 96} Both FRIC and Cheek solicited Taylor Jarvis in an effort to effect the recovery of her debt or the resolution of it. They are suppliers within the meaning of the OCSPA. We now turn to the question of whether a “consumer transaction” occurred.
{¶ 97} For purposes of the OCSPA, the term “consumer transaction” is defined to mean
a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things. “Consumer transaction” does not include transactions between persons, defined in sections 4905.03 and 5725.01 [financial institution defined] of the Revised Code, and their customers, except for transactions involving a loan made pursuant to sections 1321.35 to 1321.48 of the Revised Code and transactions in connection with residential mortgages between loan officers, mortgage brokers, or nonbank mortgage lenders and their customers; transactions involving a home construction service contract as defined in section 4722.01 of the Revised Code; transactions between certified public accountants or public accountants and their clients; transactions between attorneys, physicians, or dentists and their clients or patients; and transactions between veterinarians and their patients that pertain to medical treatment but not ancillary services.
R.C. 1345.01(A).
{¶ 98} Relying on this court’s decision in Reagans v. MountainHigh Coachworks, Inc., 117 Ohio St.3d 22, 2008-Ohio-271, 881 N.E.2d 245, Cheek asserts that “the definition of ‘consumer transaction’ explicitly and specifically excludes transactions between financial institutions and their customers” and that the exemption extends to “bank assignees,” which Cheek contends includes both FRIC and Cheek. We disagree.
*657 {¶ 99} Reagans is wholly distinguishable from this ease. That case involved litigation brought by plaintiffs against the seller and the manufacturer of their motor home, which the plaintiffs claimed was defective. The plaintiffs sought recovery under various causes of action, including alleging a violation of the OCSPA. Id. at ¶ 1. The plaintiffs also alleged that the bank that loaned them the money for the purchase was derivatively liable for their claims against the seller. Id.
{¶ 100} In addressing that claim, we held that a bank cannot be held derivatively liable pursuant to a Federal Trade Commission (“FTC”) regulation or rule for an award of treble damages and attorney fees against a seller of goods under the OCSPA. Id. at ¶ 2-3. Our analysis was driven, in part, by the recognition that transactions between financial institutions and their customers are exempted from the definition of a “consumer transaction” within the meaning of R.C. 1345.01(A) of the OCSPA. Id. at ¶ 33. See also Jackson v. Sunnyside Toyota, Inc., 175 Ohio App.3d 370, 2008-Ohio-687, 887 N.E.2d 370, ¶ 7 (8th Dist.) (“ ‘Consumer transactions’ do not include transactions between ‘financial institutions’ and their customers. See R.C. 1345.01(A) and 5725.01(A)”). That exemption shielded the bank from direct liability and permitted derivative liability only to the extent that the FTC required derivative liability. Reagans at ¶ 33.
{¶ 101} Here, Cheek asserts that because Chase (which we will presume for purposes of this case to be an exempt “financial institution” within the meaning of the OCSPA) would be shielded from OCSPA liability for its own attempts to collect the debt from Taylor Jarvis, Cheek is similarly exempt because it was attempting to collect the debt on behalf of FRIC, which purchased the debt that had been owed to Chase. We do not agree.
{¶ 102} Neither FRIC nor Cheek is a financial institution within the meaning of the OCSPA. As amicus curiae the state of Ohio correctly argues, the exemption for banks and financial institutions applies only to transactions with certain specific entities, namely, banks and financial institutions as defined by R.C. 1345.01(A) and 5725.01. Cheek fails to establish that those statutes, or any other statutes in the Revised Code, confer an exemption on FRIC, a debt buyer that purchased a debt that originated in a transaction involving an exempt financial institution, or on Cheek merely because it contracted with and represented a debt buyer. And we reject any notion that a debt collector and its attorneys can be permitted “derivative use” of the financial-institution exemption in the OCSPA based solely on the fact that the debt at issue originated between a financial institution and a consumer. See Foster, 463 F.Supp.2d at 783, fn. 42 (rejecting a nonphysician debt collector and its attorney’s invocation of the exemption in the OCSPA that applies to physicians regarding their attempts to
collect debts arising from patient-physician health-care transactions); Kline v. *658 Mtge. Electronic Registration Sys., Inc., S.D.Ohio No. 3:08cv408, 2010 WL 1267809, *5 (Mar. 30, 2010) (holding that the financial-institution exemption in the OCSPA applies to national banks and not to subsidiaries of those banks).
{¶ 103} Cheek additionally asserts that our decision in Anderson, 136 Ohio St.3d 31, 2013-Ohio-1933, 989 N.E.2d 997, supports that no “consumer transaction” on which to base an OCSPA action occurred in this case. FRIC presents arguments on this point that also rely heavily on Anderson. But Anderson is inapposite here.
{¶ 104} Anderson arose from interactions between mortgage-service providers and homeowners. We held that the OCSPA did not apply to the mortgage-service providers for three key reasons not presented here.
{¶ 105} First, in Anderson we held that because “[mjortgage servicing is a contractual agreement between the mortgage servicer and the financial institution that owns both the note and mortgage,” there was no “consumer” transaction within the meaning of the OCSPA. Id. at ¶ 12-13. Second, we recognized that land transactions are frequently regulated by specialized legislation and thus are excluded from the Uniform Consumer Sales Practices Act, on which the OCSPA is modeled. Id. at ¶ 18. And third, we found that that the legislative history of the OCSPA amply demonstrated that the General Assembly did not intend for the OCSPA to apply to mortgage-service providers. Id. at ¶ 20-25.
{¶ 106} None of the factors that were critical to our analysis in Anderson is present here. We therefore reject Cheek’s and FRIC’s arguments that debt collectors and their attorneys are exempt from the OCSPA.
CONCLUSION
{¶ 107} We hold that Ohio’s borrowing statute applies in this case and that therefore, Delaware’s statute of limitations applied to FRIC’s debt-collection action against Taylor Jarvis. We further hold that FRIC’s complaint against Taylor Jarvis was time-barred and that the filing of a time-barred collection action may form the basis of violations under the FDCPA and the OCSPA. We also hold that FRIC’s claim in its complaint for interest that is unavailable by law was a demand made upon Taylor Jarvis rather than an aspirational request to the trial court and thus can be the basis of an actionable claim under the FDCPA and the OCSPA. We remand the case to the trial court for a determination of those causes of action, including a consideration of whether the FDCPA’s bona-fide-error defense is applicable, and for a determination of the cause of action for abuse of process. Finally, we hold that debt buyers collecting on credit-card debt and their attorneys are subject to the OCSPA.
*659 {¶ 108} Accordingly, we affirm the judgment of the court of appeals that reversed the trial court’s granting of FRIC’s and Cheek’s motions for summary judgment and remand the cause to the trial court for further proceedings consistent with this opinion.
Judgment affirmed and cause remanded.
O’Neill, J., concurs.
Lanzinger, J., concurs in judgment only.
Kennedy, J., concurs in part and concurs in the judgment, with an opinion joined by O’Donnell, J.
O’Connor, C.J., dissents, with an opinion joined by French, J.

. Taylor Jarvis was the original appellee in the appeal to this court, but she died during its pendency. Brian Taylor, the executor of her estate, has been substituted for her as the appellee.