PUBLISHED

*VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **19th** *day of* **March, 2024**.

Mazie Green, Appellant,

against        Record No. 0144-22-3
              Circuit Court No. CL21000587-00

Portfolio Recovery Associates, LLC, Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Beales, Huff, O'Brien, AtLee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael Lorish, Callins and White

On March 1, 2023 came the appellee, by counsel, and filed a petition requesting that the Court set aside the judgment rendered herein on February 20, 2024, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court. The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,
      Teste:

            A. John Vollino, Clerk

            *original order signed by a deputy clerk of the*
   By:     *Court of Appeals of Virginia at the direction*
            *of the Court*
               Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

**PUBLISHED**

Present:    Judges Malveaux, Ortiz and Causey
Argued at Lexington, Virginia


MAZIE GREEN

v.        Record No. 0144-22-3

PORTFOLIO RECOVERY ASSOCIATES, LLC

OPINION BY
JUDGE DORIS HENDERSON CAUSEY
FEBRUARY 20, 2024


FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
Edward K. Stein, Judge

Mazie Green, *pro se*.

L. Steven Emmert (James K. Trefil; Jonathan P. Floyd; Sykes,
Bourdon, Ahern & Levy, PC; Troutman Pepper Hamilton Sanders
LLP, on brief), for appellee.


Mazie Green, *pro se*, appeals the circuit court order ruling for Portfolio Recovery

Associates, LLC ("PRA") in a debt-collection action.  The circuit court granted judgment to PRA in

the amount of $8,914.31.  On appeal, Green argues that PRA did not have standing to sue, that the

court erred by failing to consider her counterclaim alleging PRA violated the Fair Debt Collections

Practices Act ("FDCPA"), and that by releasing her cash bond to PRA, the General District Court of

Alleghany County violated the Fourteenth Amendment and FDCPA by issuing a recognizance on

PRA's behalf.  Finding that PRA failed to prove it owned Green's debt, we reverse the circuit

court's decision.

BACKGROUND[1]

In December 2020, PRA, a debt buyer,[2] filed a warrant in debt against Green in Alleghany

County General District Court,[3] "alleging that she had defaulted on a [CIT] Bank credit card debt,

with an original account ending number of 7068 and a balance due of $8,914.31." PRA asserted

that it was the assignee of the debt. In support of its claim, PRA filed a bill of particulars, which

had the following documents attached as exhibits:

- A February 2020 letter from PRA to Green, listing the original creditor as CIT Bank and an "[o]riginal [a]ccount [n]umber" ending in 7068, and demanding payment on a balance due of $8,914.31

- A September 2010 document labeled "bill of sale" from CIT Bank to Webbank

- An August 2013 document labeled "bill of sale" from Webbank to Comenity Capital Bank

- A July 2018 document labeled "bill of sale" from Comenity Capital Bank to Synchrony Bank

---

[1] Because PRA prevailed at trial, "we recite the relevant facts in the light most favorable" to PRA and presume the factfinder accepted any reasonable inferences from those facts. *See Nichols Constr. Corp. v. Va. Mach. Tool Co.*, 276 Va. 81, 84 (2008). The record contains a written statement of facts in lieu of a transcript from trial, as permitted by Rule 5A:8(c). The statement of facts was prepared by Green and adopted by the circuit court over PRA's objection. Accordingly, we accept the court's signed statement of facts as the established facts of the case. *See* Rule 5A:8(d) ("The judge's signature on a transcript or written statement, without more, constitutes certification that the procedural requirements of this Rule have been satisfied.").

[2] Although Virginia has not adopted a definition of "debt buyer," we may rely on other jurisdictions' definitions as persuasive authority. *Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016) (relying on out-of-state cases as persuasive authority). A debt buyer is a person or entity that engages in the business of purchasing charged-off (charged-off means the act of a creditor that treats an account receivable or other debt as a loss or expense because payment is unlikely, Md. Rule 3-306) consumer debt for collection purposes, whether it collects the debt itself, hires a third party for collection, or hires an attorney-at-law for collection litigation. Cal. Civ. § 1788.50.

[3] This case involved a de novo appeal from the Alleghany County General District Court. The filings of the general district court are those relied upon in the circuit court.

- A June 2019 document labeled "bill of sale" from Synchrony Bank to PRA

- A two-column spreadsheet for an account number ending in 7068 with Green's name, but no creditor name, headings identifying the source or purpose of the document, or means of tying the record to any of the bills of sale

- An August 2020 declaration of James O'Toole, custodian of records for PRA, stating: "According to the records transferred to the Account Assignee from Account Seller, and maintained in the ordinary course of business by the Account Assignee, there was due and payable from Mazie Green . . . to the Account Seller the sum of $8,914.31 with respect to the account number ending in 7068." The affidavit stated that this finding was "based upon a review of the business records of the Original Creditor CIT BANK/PAYPAL and those records transferred to [PRA] from SYNCHRONY BANK . . . , which have become a part of and have integrated into [PRA]'s business records, in the ordinary course of business."

- A Synchrony Bank pricing information addendum for "PayPal credit account ending in 7068"

- Monthly PayPal billing statements, spanning July 2017-September 2018, listing customer name Mazie Green and an account number ending in 8616.

The "bills of sale" did not mention any specific debtor names or account numbers or include any attachments with that information. None of the bills of sale listed Green's name or account number. Additionally, transfer agreements identifying which specific accounts were sold were not attached to any bill of sale. PRA's custodian of records claimed that such records (which perhaps identified Green, or any accounts/agreements) were confidential. The PayPal billing statements showed that someone named Mazie Green last used the account on March 3, 2018, and that the last payment on the account was on February 12, 2018.

In response to the complaint, Green filed a grounds of defense asserting that PRA lacked standing to sue her because it had not produced evidence of chain of title[4] to prove its ownership of the debt. Prior to this, Green had asked repeatedly for the debt to be validated. Green also filed a counterclaim for $1,000 under the Fair Debt Collection Practices Act (FDCPA). She argued that PRA violated the FDCPA by "not reviewing their business records or ones they have been allegedly assigned," "robo-signing" the affidavit of James O'Toole, and attaching "a deceptive, misleading, and undated letter" to the warrant in debt informing her that a lawsuit had been filed. Green also sought a declaratory judgment that PRA violated the FDCPA.

In April 2021, Green sent a request for a continuance to the general district court. Green "received no response to her request and appeared, prepared for trial on May 24, 2021." At trial, PRA "said they were not prepared for trial because of . . . Green's letter and their witness was not there." Green signed a recognizance, promising to appear for a hearing in July 2021.

Following an agreed-upon continuance, the general district court conducted a hearing in September 2021. The general district court ruled for PRA and dismissed Green's FDCPA counterclaim. The general district court set an appeal bond of $8,977.31, which Green posted when she appealed the ruling to the circuit court.

Green moved for summary judgment in the circuit court, asserting that PRA lacked standing. Green informed the circuit court that "[t]he original account ending number was 7068, but [PRA] provided the [c]ourt with a Pay[P]al Credit statement account number ending in 8616." Green argued that PRA had "(1) no valid proof of assignment [validation of the debt], (2) no proof that the original account number ending in 7068 changed to account number ending in 8616, and

_____

[4] Chain of title is admissible documentation establishing that the debt buyer is the owner of the specific debt at issue. The chain of title must be unbroken.

- 4 -

(3) ha[d] no contract for C[IT] Bank account ending in 7068." She claimed that she was therefore entitled to judgment as a matter of law. The circuit court denied Green's motion.

The circuit court held a bench trial in November 2021. At trial, PRA called Lecinda Stacy, a PRA custodian of records, as a witness. On cross-examination, Stacy testified that the account being sued upon ended with 7068. Stacy testified that each bill of sale was accurate and complete, but also that no bill of sale included any attachments. When asked why the transfer agreements identifying which specific accounts were sold were not attached to each bill of sale, Stacy said that the specific accounts were confidential because they contained other individuals' names and account numbers. Stacy also testified that none of the bills of sale listed Green's name or account number. Stacy further testified that the data sheet listing an account number ending 7068 included with the bill of particulars lacked the creditor's name and was created at or near the time that accounts were sold to PRA. Finally, Stacy testified that the account number on the PayPal credit billing statement ended in 8616 and when asked by Green "if the account ending number of 7068 was the same as the account ending number 8616," Stacy said, "no." Overall, Stacy did not provide any information that Green was the debtor or articulate why PRA was suing this particular Mazie Green. Other than having the same name, PRA was unable to provide any other identifying information connecting Green to the alleged debt owed.

Green submitted into evidence PRA's notice of filing of a warrant in debt. She also submitted an email conversation with a PRA attorney from September 2021. In the email exchange, Green asked the attorney why the account number in the billing statements differed from the original CIT Bank account number and the attorney responded, "[s]ince the account was sold to other creditors numerous times since originally opened in 2010, I do not have a record of the exact time the original account number was changed." The attorney recommended Green contact CIT Bank for more information.

PRA sought to introduce an affidavit from Oscar Castillo, an "Affidavit Documentation Specialist" at Synchrony Bank, dated November 16, 2021. Castillo's affidavit stated that Green was "issued a credit card account with account number ending in 8616" on September 16, 2018, and then the "account number was changed from account ending in 8616 to account ending in 7068" on June 24, 2019. The affidavit also attested that the account was sold to PRA on June 27, 2019, and that Synchrony Bank's records documented the sale. PRA also introduced all the exhibits to its bill of particulars.

After hearing the parties' evidence and arguments, the circuit court ruled for PRA. The circuit court held that PRA could recover $8,914.31 from Green and ordered the circuit court clerk to release the appeal bond to PRA to satisfy the judgment. The court also found that Green's counterclaim failed. This appeal follows.

ANALYSIS

I. Ownership of the Debt

Green argues PRA could not recover from her because PRA failed to prove it owned her debt. We agree.

*A. The Debt Buying Industry*

PRA is a debt buyer. The debt buying industry has exploded over the past twenty years. *See* Fed. Trade Comm'n, *The Structure and Practices of the Debt Buying Industry* 12-14 (2013) http://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf [hereinafter *Structure and Practices*]. The growth in this industry has inevitably led to litigation. Courts around the country have been compelled to confront their practices. Virginia courts have little precedent related to debt buying, so we rely on cases from other jurisdictions and secondary sources to provide a framework and backdrop to better

understand the industry. *Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016) (relying on out-of-state cases as persuasive authority).

The debt-buying industry works in the following manner: first, a creditor and a consumer enter a contract by which the creditor (i.e., a bank) extends credit to the consumer—often through a credit card—in exchange for a promise to be repaid later. *Structure and Practices*, *supra*, at 11, 13. When a consumer falls behind on repaying a creditor, the creditor often "charge[s] off" the debt as unrecoverable and sells the rights to recover the debt to a debt buyer who specializes in collecting delinquent debts. *Taylor v. First Resol. Inv. Corp.*, 72 N.E.3d 573, 578 (Ohio 2016); Consumer Fin. Prot. Bureau, *Fair Debt Collection Practices Act: CFPB Annual Report 2013*, at 9 (2013), https://files.consumerfinance.gov/f/201303_cfpb_March_FDCPA_ Report1.pdf. The debts sold are usually "bundled" into portfolios of many accounts, which the debt buyer purchases at cents on the dollar compared to the face value of the collective debt owed. *Taylor*, 72 N.E.3d at 578; *Structure and Practices*, *supra*, at 7-8, app. D (study showing that between 2006 and 2009, the nine largest debt buyers—including PRA—collectively purchased consumer debt with face value of $143 billion for $6.5 billion). The debt buyer then either attempts to collect the debt or sells the debt to another debt buyer. *Structure and Practices*, *supra*, at 19. "Many debts are purchased and resold several times over the course of years before either the debtor pays the debt or the debt's owner determines that the debt can be neither collected nor sold." *Id.* at 1.

Debt buying has a role to play in the consumer lending industry. "Debt buying can reduce the losses that creditors incur in providing credit, thereby allowing creditors to provide more credit at lower prices." *Id.* at i. But the business model depends on debt buyers using the legal process (or the threat of a lawsuit) to collect on enough of the many debts they have bought to generate a profit. *See Taylor*, 72 N.E.3d at 578. And that is when problems can arise.

In the course of a debt being sold several times, "documentation of information about the debt is often lost." *Id.* In a 2013 study, the Federal Trade Commission (FTC) found that while buyers receive some information about the debt they are purchasing, "[f]or most portfolios, buyers did not receive any documents at the time of purchase" and "[o]nly a small percentage of portfolios included documents, such as account statements or the terms and conditions of credit." *Structure and Practices*, *supra*, at ii-iii. Without adequate documentation, debt buyers can have trouble proving in court that they own the debts they seek to collect. Some debt buyers get around this by having employees sign affidavits for hundreds or thousands of debts per day, attesting personal knowledge of the facts of each case despite the impossibility of verifying the information for that many accounts that quickly (a practice called "robo-signing"). Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases*, 6 J. Bus. & Tech. L. 259, 268-69 (2011). But even for debt buyers acting in good faith, documentation is only a problem if the debt buyer is in fact forced to prove it owns a debt. "Empirical evidence shows that many debt buyers using a high volume of lawsuits as a component of their recovery strategy rely heavily on the assumption that consumers often fail to show up to contest the case," allowing debt buyers to win default judgments. *Taylor*, 72 N.E.3d at 578-79 (quoting Note, *Improving Relief from Abusive Debt Collection Practices*, 127 Harv. L. Rev. 1447, 1449 (2014)) [hereinafter *Improving Relief*]); *see also id.* at 578 (observing that the debt buying industry is "dependent in large part on the acquiescence, ambivalence, or ignorance of consumers").

Lack of adequate documentation leads to mistakes. "A predictable result of debt buyers filing a high volume of lawsuits based on imperfect information is that lawsuits are regularly filed after the right to collect debts has expired or that seek to collect a debt that is not owed." *Id.* at 579; *see also Structures and Practices*, *supra*, at i (because debt buyers "may have

insufficient or inaccurate information when they collect on debts," debt buyers can end up "seeking to recover from the wrong consumer or recover the wrong amount"). The FTC found that from 2006 to 2009, debt buyers "sought to collect about one million debts [per year] that consumers asserted they did not owe." *Structures and Practices*, *supra*, at iv. That rate of disputed debts alone "is a significant consumer protection concern" to the FTC. *Id.* at 39.

But the number of debts disputed likely understates the lack of information problem because consumers often do not challenge debts. *Id.* at 38. Ninety percent or more of consumers sued in debt collection actions do not appear in court to defend themselves, resulting in many default judgments. *Id.* at 45. Some consumers do not receive the validation notices that debt collectors are required to send before collecting on the debt; others "may not read or understand the validation notice because it does not identify the original creditor, they may assume it is junk mail, or they find writing a letter to be unduly burdensome." *Id.* at 38. And "many consumers may not respond due to a misunderstanding of the legal procedures required to avoid default." *Taylor*, 72 N.E.3d at 579 (quoting *Improving Relief*, *supra*, at 1449).

In short, debt-buying industry practices often result in documentation problems. These very problems are presented in this action. Green raised these issues, and we now address her argument that PRA failed to prove it owned her debt.

### B. PRA Lacked Standing

Green frames her argument as a question of PRA's standing to sue her. She argues that because PRA failed to prove it owned a debt she owed, it lacked a personal stake in the outcome, and thus lacked standing, rendering PRA's suit against her "a legal nullity." *See Kocher v. Campbell*, 282 Va. 113, 119 (2011). Green presents a relatively unsettled question on appeal— whether a plaintiff attempting to collect on a delinquent obligation without proof that it owns the debt raises a question of standing or a defect in the plaintiff's case-in-chief. Courts in other

jurisdictions are split on the issue,[5] and Virginia has only considered the matter in the context of real property.[6]  We hold that the assignment of rights alleged here created a standing issue.[7]  Further, because PRA failed to establish its ownership of a debt owed by Green,[8] we hold that PRA had no legally cognizable interest in the alleged controversy.

---

[5] *Compare Unifund CCR v. Ayhan*, 146 Wash. App. 1026 (Wash. Ct. App. 2008) (treating insufficient proof of ownership of debt as a question of standing), *and Deutsche Bank Nat'l Tr. Co. v. Mitchell*, 27 A.3d 1229, 1234-35 (N.J. Super. Ct. App. Div. 2011) ("As a general proposition, a party seeking to foreclose a mortgage must own or control the underlying debt.  In the absence of a showing of such ownership or control, the plaintiff lacks standing to proceed with the foreclosure action and the complaint must be dismissed." (internal punctuation and citations omitted)), *with Nyankojo v. N. Star Cap. Acquisition*, 679 S.E.2d 57, 58, 61 (Ga. Ct. App. 2009) (holding that debt buyer lacking proof of assignment failed to establish the elements of its case, despite defendant framing question as one of standing), *and Cap. Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 757 Fed. App'x 229, 232 n.1 (4th Cir. 2018) (noting that although the lower court "framed its analysis [of whether the plaintiff proved assignment] as [the plaintiff]'s failure to establish standing . . . , the proper inquiry is whether [the plaintiff] failed to state a claim for breach of contract").

[6] *Morgan v. Board of Supervisors of Hanover County*, ___ Va. ___, ___ (Feb. 2, 2023), established that a defense to liability does not implicate standing in Virginia merely because it "requires proof of a specific legal right that was infringed and that is capable of being remedied by a court."  In *Morgan*, the Virginia Supreme Court considered whether the plaintiffs had standing to challenge a zoning exception issued by the local board that authorized the construction of a 1.7 million square foot grocery distribution center. *Id.* at ___.  Roderick Morgan, a property owner whose land was located within a thousand feet of the proposed facility, was among the many neighbors that disputed approval of the project and brought action. *Id.* at ___.  Although none of the class members held an ownership interest in the subject property, the Court held they had standing to challenge the zoning determination after the plaintiffs (1) proved ownership of property in close proximity to the subject property and (2) alleged facts of a particularized harm arising out of the board's approval of the plan. *Id.* at ___.  In its reversal of the circuit court's decision that the plaintiffs did not have standing, the Court reiterated that the actual controversy requirement protects courts from issuing advisory opinions—an essential concern of the standing doctrine—and cautioned courts to avoid "conflat[ing] the threshold standing inquiry with the merits of [a litigant's] claim." *Id.* at ___ (second alteration in original) (quoting *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009)).

[7] *See* discussion *infra* Section I.C.

[8] The Consumer Financial Protection Bureau has enjoined PRA from collecting the type of debt Green has disputed without offering to provide Original Accounting Level Documentation.  Filing lawsuits for unsubstantiated debt is also prohibited. *In the Matter of:*

Whether a litigant has standing is subject to de novo review. *Platt v. Griffith*, 299 Va. 690, 692 (2021) ("We review de novo the question of whether the appellants' factual allegations were sufficient to establish standing, as this issue presents a question of law.").

"[S]tanding to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action." *McClary v. Jenkins*, 299 Va. 216, 221 (2020) (quoting *Andrews v. Am. Health & Life Ins. Co.*, 236 Va. 221, 226 (1988)). "The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." *Anders Larsen Tr. v. Bd. of Supervisors of Fairfax Cnty.*, 301 Va. 116, 120 (2022) (quoting *Cupp v. Bd. of Supervisors of Fairfax Cnty.*, 227 Va. 580, 589 (1984)). Here, PRA did not provide or identify any information that showed that it had any "substantial legal rights" that would be affected—namely, that PRA owned a debt owed by Green.

"[S]tanding requires particularized harm to 'be fairly traceable to the challenged action of the defendant.'" *Morgan v. Bd. of Supervisors of Hanover Cnty.*, ___ Va. ___, ___ (Feb. 2, 2023) (quoting *Mattaponi Indian Tribe v. Va. Dep't of Env't Quality, ex rel. State Water Control Bd.*, 261 Va. 366, 376 (2001)). A plaintiff must "[allege] that [the particular] defendant [engages in the type of activity] that causes or contributes to the kinds of injuries alleged." *Chesapeake Bay Found., Inc. v. Commonwealth, ex rel. Va. State Water Control Bd.*, 52 Va. App. 807, 825 (2008) (alterations in original) (emphasis omitted) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 161 (4th Cir. 2000)).

Similarly, here, we must determine whether Green took actions that were fairly traceable to the injury of which PRA complains. The FDCPA requires debt collectors to validate consumers'

*Portfolio Recovery Assocs., LLC*, CFPB No. 2015-CFPB-0023 (Sept. 9, 2015), https://files. consumerfinance.gov/f/201509_cfpb_consent-order-portfolio-recovery-associates-llc.pdf.

debts within five days of the initial communication[9] with a consumer. 15 U.S.C.A. § 1692g(a).

The validation information must be clear and conspicuous. Per 15 U.S.C.A. § 1692g(a), a debt

collector must provide the following information to validate a debt:

- the amount of the debt;

- the name of the creditor to whom the debt is owed;

- a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

- a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

- a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

Once the validation information is provided, the consumer has 30 days to dispute the validity of

the debt and/or request the information about the original creditor. 15 U.S.C.A. § 1692g(b). "If

the consumer notifies the debt collector" within this thirty-day period, the debt collector must

> cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

*Id.*

PRA asserts ownership of Green's debt through a series of assignments. When pursuing an

action on a contract or instrument assigned, an assignee "stands in the shoes" of the assignor,

---

[9] A formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a). 15 U.S.C.A. § 1692g(d).

- 12 -

obtaining all the assignor's rights and remedies. *Union Recovery Ltd. P'ship v. Horton*, 252 Va. 418, 423 (1996) (quoting *Mountain States Fin. Ress. Corp. v. Agrawal*, 777 F. Supp. 1550, 1552 (W.D. Okla. 1991)). Our Supreme Court has long held that a party seeking to prove ownership of a contractual right by assignment bears the burden of proving that the assignment occurred. *See Tennent's Heirs v. Pattons*, 33 Va. (6 Leigh) 196, 207 (1835) (Carr, J.) (finding trial court erred in allowing plaintiffs to sue as assignees where no proof of assignment was in the record). Although Virginia courts have not outlined precisely how to prove a legal assignment occurred, other courts have held that "there must be evidence of an intent to assign or transfer the whole or part of some specific thing, debt, or chose in action and the subject matter of the assignment must be described sufficiently to make it capable of being readily identified." 29 *Williston on Contracts* § 74:1 (4th ed. 2022) (collecting cases). And to recover a debt from a purported debtor, a party must prove that it owns the right to the *specific* debt at issue. *See Lewis's Ex'r v. Bacon's Legatee*, 13 Va. (3 Hen. & M.) 89, 114 (1808) (Fleming, J.). A debt buyer who alleges a right to a debt by assignment thus must trace the chain of its title to the specific debt it seeks to recover. The trace of the chain of title may not be broken. It must be continuous to establish the assignment.

A debt buyer (or any purported owner of the right to recover a debt) may introduce several forms of evidence to prove ownership of the specific account at issue. PRA sought recovery on breach of contract and account stated theories. For a debt based on a written contract, the best-evidence rule requires that "where the contents of a writing are desired to be proved, the writing itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted." *Brown v. Commonwealth*, 54 Va. App. 107, 115 (2009) (emphasis omitted) (quoting *Bradshaw v. Commonwealth*, 16 Va. App. 374, 379 (1993)). If the original contract is unavailable, Code § 8.01-32 provides that a plaintiff may still bring suit on "any past-due lost . . . contract . . . or other written evidence of debt, provided the plaintiff

- 13 -

verifies under oath either in open court or by affidavit that said . . . contract . . . or other written evidence of debt has been lost or destroyed." For a debt based on an account stated, the plaintiff must prove that "the accounts between the parties have been either actually settled, or are presumed to be so from the circumstance of a party's retaining, for a long time, without objection, the account of the other party, which has been presented to him, showing a balance against him." *Ellison v. Weintrob*, 139 Va. 29, 35 (1924) (quoting *Watson v. Lyle's Adm'r*, 31 Va. (4 Leigh) 236, 249 (1833)). Relevant evidence for an account stated includes documentation or sworn testimony that a balance is final and definite and that the plaintiff sent account statements received by the defendant without the defendant's objection within a reasonable time. *See id.* at 31, 35-36; *Radford v. Fowlkes*, 85 Va. 820, 852 (1889).

A debt buyer must then introduce evidence to prove that it has been assigned that original contract or account between creditor and debtor. For debt buyers, available documentation typically includes the purchase and sale agreements between each assignor and assignee in the chain of title, along with files listing information on the specific accounts transferred from assignor to assignee. *See New Century Fin. Servs., Inc. v. Oughla*, 98 A.3d 583, 591 (N.J. Super. Ct. App. Div. 2014). Under Virginia Rules of Evidence 2:803(6) and 2:902(6), a debt buyer can produce a live witness or affidavit of a custodian of record *if* the testimony or certification can show that someone with personal knowledge produced a reliable record of the debt and its transfer in the ordinary course of business. And the debt buyer can present live witness testimony about the ownership of the debt more generally, so long as "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Va. R. Evid. 2:602.

Again, whatever admissible evidence the plaintiff chooses to present must meet its burden of proof to show it owns the *specific* debt at issue. *See Lewis's Ex'r*, 13 Va. (3 Hen. & M.)

- 14 -

at 114. To trace a series of assignments back to the original creditor-debtor contract and prove the plaintiff owns the defendant's debt, evidence of each assignment must contain, at minimum, the debtor's name and account number associated with the debt.

This case's facts are analogous to *Green v. Ashby*, 33 Va. (6 Leigh) 135 (1835). In *Ashby*, the trial court found that the plaintiff, who alleged he had been assigned the right to payment of a judgment debt against the debtor, could recover from the defendant, who was the purported assignor's attorney and had been paid the judgment debt. *Id.* at 135. The plaintiff presented the following evidence that a purported assignor had assigned him the right to collect: bills for fees that the purported assignor owed the plaintiff; a "mutilated paper, of which no sense c[ould] be made" which the plaintiff testified was authority to prosecute and recover the judgment from the debtor; and testimony from a witness who said the plaintiff had told him the plaintiff had an interest in the claim, but that he "never saw any assignment." *Id.* at 144 (Carr, J.). Our Supreme Court reversed. Justice Carr found that even "allowing [the evidence] the utmost weight that in fairness can be claimed for it, it proves no transfer of th[e] debt . . . from [the purported assignor] to the [purported assignee]." *Id.* While the assignee said the debt was his, "surely, this, without assent or even knowledge of the claim by [the assignor], could prove nothing." *Id.* The scant evidence could not "create that privity which is necessary to support an action" by the plaintiff against the defendant. *Id.* at 145.

As in *Ashby*, to prove it had been assigned Green's debt, PRA introduced several pieces of documentary evidence along with testimony supporting those documents. And, as in *Ashby*, PRA needed more evidence to meet its burden to prove it owned the right to recover on Green's specific account.

In other words, who owes the debt and who legally can collect the debt must be stated clearly in the documentary evidence. Random spreadsheets with numbers do not meet the burden to

prove who owns the right to recover a debt.  A bill of sale must contain all the information and attachments to authenticate the debt.  At a minimum, the bill of sale must identify the debtor and the amount of debt owed.  The debt cannot be authenticated if there is no information in the bill of sale that identifies the person or company regarding the details of the debt.

First, the documents PRA produced include no evidence that Green's account traced back from PRA to CIT Bank.  PRA sought to trace its ownership of Green's debt back to CIT Bank through a series of four bills of sale: from CIT Bank to Webbank in September 2010, from Webbank to Comenity Capital Bank in August 2013, from Comenity Capital Bank to Synchrony Bank in July 2018, and from Synchrony Bank to PRA in June 2019.  The first three bills of sale are one-page documents that mention only "accounts" or "assets" transferred between the companies; no attachments are mentioned in the bills of sale, and no documents introduced to the record list the specific account numbers transferred in each sale.  The final bill of sale from Synchrony Bank to PRA mentions "the Accounts as set forth in the Notification Files," but PRA did not produce the "notification files."  PRA did produce a two-column spreadsheet with data for an account number ending in 7068 with Green's name, but the spreadsheet lacked a date, creditor name, and any means of tying the spreadsheet to a specific bill of sale or otherwise identifying the source or purpose of the document.[10]  It also produced a Synchrony Bank "pricing information addendum" for an account ending in 7068, which PRA points to on brief as the "underlying PayPal account

---

[10] PRA argues it could not produce further documentation of the accounts sold because doing so would result in other customers' confidential account information being included.  We agree that other customers' confidential account information has no relevance and should not be produced.  But PRA's argument neither explains why a spreadsheet or other documentation could not be produced for each bill of sale for *Green's* debt specifically, nor why the spreadsheet produced includes no headings or other information that tie it back to a specific bill of sale.

- 16 -

agreement," but the addendum lacked Green's name, signature, and the date of the agreement.[11]
And the monthly PayPal billing statements from July 2017 through September 2018 listing customer name Mazie Green list a different account number ending in 8616 and fail to cover the first 7 years of the account's alleged history. We find this jumble of documents, without more, akin to the mutilated paper in *Ashby* that purported to show the plaintiff had been assigned the claim he sought to recover on.

With the documents unable to support chain of title or even the existence of the initial agreement, that leaves the affidavits and testimony through which PRA sought to tie the documents together. PRA introduced as a trial exhibit an affidavit signed and dated November 16, 2021—the day before trial—by Castillo, "[s]enior [m]edia [a]ffidavit [r]epresentative" at Synchrony Bank. Castillo attested that, based on his review of Synchrony Bank's records, Green was issued a credit card account ending 8616 on September 16, 2018, that account was changed to a number ending 7068 on June 24, 2019, and the account was sold to PRA on June 27, 2019. PRA also presented Stacy, a PRA custodian of records, as a trial witness. Stacy testified that the two-column spreadsheet with account number ending 7068 was produced near the time of the sale from Synchrony to PRA.[12] She did not testify that Green's specific name and account number were part

---

[11] In addition to being evidence that PRA did not own Green's debt, we note that this could also be evidence that PRA failed to produce an underlying contract or agreement. *See Brown*, 54 Va. App. at 115; *Bradshaw*, 16 Va. App. at 379. Code § 8.01-32 outlines the procedures for lost written evidence of a debt, but the record does not include evidence that PRA "verifie[d] under oath either in open court or by affidavit that said . . . contract . . . or other written evidence of debt has been lost or destroyed." That said, Green did not assign error to the trial court on this point.

[12] Stacy also testified on cross-examination that the account number on the PayPal credit billing statements ended 8616, and when asked by Green "if the account ending number of 7068 was the same as the account ending number 8616," Stacy said, "no." This response could reasonably be interpreted as an admission that the two accounts were different. But viewing the facts in the light most favorable to PRA, we assume Stacy was making the equally reasonable observation that 7068 and 8616 are two different numbers.

of each assignment in the alleged chain of title—which, of course, she could not, because as custodian of records at PRA, she could at most have personal knowledge, required by Rules 2:602 and 2:803(6), of the transaction between Synchrony Bank and PRA. She testified only that, for each of the four bills of sale, the transfer agreement that would presumably list the specific account numbers transferred could not be produced because "they contained the names and account numbers of others" and were thus "confidential." On balance, in the light most favorable to PRA, Castillo's affidavit and Green's testimony show only that Synchrony information for an account ending 8616 in Green's name was changed to one ending 7068 just before sale, and that account was sold to PRA. Castillo and Stacy said nothing from which the circuit court could conclude that the chain of title for an account in Green's name passed from CIT Bank to Webbank, Webbank to Comenity Capital Bank, or Comenity Capital Bank to Synchrony Bank. For those first three assignments, as in *Ashby*, testimony purporting to tie the documents to the chain of assignments showed no knowledge of the assignment.

However, O'Toole's affidavit that PRA owned Green's debt "based upon a review of the business records of the Original Creditor CIT BANK/PAYPAL and those records transferred to [PRA] from SYNCHRONY BANK . . . , which have become a part of and have integrated into [PRA]'s business records, in the ordinary course of business," is a single document that supports the debt owed. But O'Toole, as custodian of records at PRA, could not have had personal knowledge of the business practices of Synchrony, Comenity Capital Bank, Webbank, or CIT Bank. Thus, we hold that without more evidence that Green's account number was included in each transfer along the alleged chain of title, the circuit court was plainly wrong to find PRA proved ownership of Green's debt. O'Toole's testimony is unsupported by any documentary evidence or other testimony. And even accepting, in the light most favorable to PRA, that Castillo's affidavit and

Stacy's testimony established that the accounts ending 8616 and 7068 were the same, no evidence links either account number back to CIT Bank, Webbank, or Comenity Capital Bank.

Other jurisdictions have reached the same conclusion when debt buyers present similar evidence of ownership of a debt as what PRA presented here. The Ohio Court of Appeals reversed a trial court finding that the plaintiff debt buyer owned a debt through two assignments, holding that even if an affiant could properly authenticate "an uncertified Bill of Sale and an unconnected sheet of paper consisting of a single entry which purported to show the specific note was transferred from [the intermediate assignee] to [the plaintiff]," the plaintiff would still need to produce documentation for each account "referenc[ing] the specific account number of the debtor's account." *Premier Cap., LLC v. Baker*, 972 N.E.2d 1125, 1133, 1134 (Ohio Ct. App. 2012). The Wisconsin Court of Appeals similarly found that, for a debt allegedly assigned three times, bills of sale that "did not specifically reference any individual accounts or debts" or include any referenced attachments were not "evidence indicating that [the plaintiff] own[ed] [the defendant's] *specific debt*." *Gemini Cap. Grp., LLC v. Jones*, 904 N.W.2d 131, 136-38 (Wis. Ct. App. 2017) (also finding that "nothing in [the plaintiff's custodian of records'] affidavit reasonably implies that [the custodian] would have had personal knowledge of the prior assignments of [the defendant's] debt); *see also Wirth v. Cach, LLC*, 685 S.E.2d 433, 435 (Ga. Ct. App. 2009) (reversing trial court finding that the debt buyer owned the defendant's debt because the affidavit of the plaintiff's custodian of records "fail[ed] to refer to or attach any written agreements which could complete the chain of assignment from [the original creditor] to [the plaintiff]" and there was "no contract or [appendix] appended to the Bill of Sale which identifie[d] [the defendant]'s account number as one of the accounts [the original creditor] assigned to [the plaintiff]"); *Kenny v. Portfolio Recovery Assocs., LLC*, 464 S.W.3d 29, 34 (Tex. App. 2015) (finding no evidence of ownership of debt where bills of

sale offered to prove assignments "d[id] not identify which accounts were transferred" and instead "identifi[ed] another document that contains the information" that "[was] not a part of the record").

In sum, we hold that a plaintiff who asserts ownership of a debt by assignment must produce evidence, for *each and every* assignment, showing the chain of title for the debt passed from the original assignor to the plaintiff. At minimum, such evidence must show that the defendant's account number, along with other relevant identifying information, was included in the assignment (e.g., an attachment to a bill of sale listing account numbers and other identifying information that traces back to the bill of sale by affidavit). If the claim is based on a written contract, the plaintiff must produce evidence that the defendant signed and dated that agreement, or otherwise follow the lost document affidavit procedures at Code § 8.01-32. If documentary evidence is unavailable for a given assignment, the plaintiff must produce, by witness testimony or an affidavit, evidence from a custodian of record or other qualified individual with personal knowledge that the defendant's specific account was assigned. *See* Va. R. Evid. 2:602; 2:803(6); 2:902(6).

Even viewed in the light most favorable to PRA, the scanty and incomplete evidence in the record cannot prove that PRA owns Green's debt through a chain of title tracing back to CIT Bank. The circuit court was plainly wrong in finding otherwise.[13]

### C. PRA's Failure to Prove Ownership of Green's Debt

Even if PRA did have standing to sue Green, the circuit court erred in ruling in favor of PRA because there is no reliable evidence in the record to support its claim.[14] PRA failed to take

---

[13] Because we reverse and vacate the judgment against Green, we need not reach her third assignment of error, which argued that the court's decision to pay PRA the cash bond in the amount of the alleged debt violated Green's right to due process and right to be free from illegal seizure.

[14] In her brief, Green's arguments focus on the lack of evidence presented by PRA. Further, she argues that "The absence of specific documents mentioned in the [bills of sale] make an assignment unclear." These are arguments about the merits of the case, specifically,

- 20 -

any reasonable steps to substantiate the accuracy and validity of the debt, and it did not provide any meaningful accounting to explain how Green's purported debt was assigned. Thus, to the extent she intended to challenge the merits of PRA's claim rather than its standing, we hold that Green should have prevailed. PRA failed to provide a reasonable level of documentary proof that it held legal title to a debt belonging to Green.

The warrant in debt lacked documentation supporting the full chain of the assignment and failed to establish that PRA owned the debt. Compounding the problem were the multiple layers of assignment. Evidence of transfer must establish an unbroken chain of ownership. Each assignment or other writing evidencing transfer of ownership must contain the debtor's name and the account number associated with the debt.

PRA's claim was based on a written instrument—a contract between PayPal and Green. But the original document was not produced, and its omission was not excused by the court for good cause or by statute. Rule 7B:5. Nor was there any indication that the original document was lost. A lost document affidavit should have been submitted, pursuant to Code § 8.01-32. Without this documentation, proof of the amount owed was not established or validated. The affidavits and various other documents did not provide proof of the debt nor the amount of the debt.

## II. Green's Counterclaim[15]

Green filed a counterclaim for $1,000 under the FDCPA, 15 U.S.C. §§ 1692-1692p. Her counterclaim alleged that PRA violated the FDCPA by "not reviewing their business records or ones they have been allegedly assigned," "robo-signing" the affidavit of O'Toole, and attaching "a

---

arguments that PRA has not sufficiently established that it owned any debt owed by Green. These arguments sufficiently contest the circuit court's ruling for PRA on the merits.

[15] In her brief, Green argues that "[t]he trial court erred as a matter of law by finding that . . . Green's FDCPA counterclaim failed." This statement sufficiently raises the argument that the trial court erred in ruling for PRA on Green's counterclaim.

deceptive, misleading, and undated letter" to the warrant in debt informing her that a lawsuit had been filed. The circuit court entered judgment against Green on her counterclaim.

As stated above in Section I.B., the FDCPA requires debt collectors to validate consumers' debts within five days of the initial communication with a consumer. The requirements of the FDCPA are laid out in that section, above. *See generally* 15 U.S.C.A. § 1692g.

A debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person in an amount set by law.[16] 15 U.S.C.A. § 1692k. In determining the amount of liability under the FDCPA in an individual action, courts are required to consider the following factors: the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional. *Id.*

Here, the circuit court abused its discretion by finding the debt was valid and dismissing Green's counterclaim. As evidenced by the record, Green repeatedly asked that her debt be validated by PRA and it was not. Although the debt is required to be validated prior to the legal proceeding, even if this Court considers Stacy's testimony at trial, PRA still did not provide the proper information to validate the debt. As outlined above, at trial Stacy testified that (i) none of the bills of sale listed Green's name or account number, (ii) the data sheet listing an account number ending 7068 included with the bill of particulars lacked the creditor's name, and (iii) the account number on the PayPal credit billing statement ended in 8616 was not the same account as the

---

[16] This includes amounts equal to the sum of "any actual damage sustained by such person as a result of" the violations; in a case filed by an individual, damages up to $1,000 in the discretion of the court; or in a class action case, individual damages for named class members up to $1,000 and a collective recovery up to $500,000 or one percent of the net worth of the offending debt collector. 15 U.S.C.A. § 1692k(a). Claimants may also recover attorney fees and costs. *Id.*

account ending number of 7068.  PRA largely bases its sufficiency argument on inadequate

spreadsheets and testimony that fails to verify that the debt was owed by Green.  Additionally, at

oral argument, both Green and PRA were asked if the debt was validated and neither party could

point to any evidence to answer that question affirmatively.

PRA asks this Court to draw an inference, based on the circuit court's statement of facts,

Castillo's affidavit, and Stacy's testimony at trial, that PRA established that the debt belonged to

Green.  However, none of these pieces of evidence, considered individually or collectively, are

enough to satisfy PRA's burden of verifying or validating the debt, and the circuit court was

plainly wrong in determining that the debt was valid.  Verifying and validating a debt are critical

parts of the debt collection process that ensures fairness in debt collections.[17]  Because PRA has

not validated the debt here, we remand the case for the circuit court to re-examine whether PRA

violated the FDCPA.

---

[17] Considering the factors laid out in 15 U.S.C.A. § 1692k, PRA's failure to validate the debt clearly demonstrated their noncompliance with the FDCPA.  The "evidence" PRA presented at trial is questionable at best and fails to validate the debt as required by the FDCPA.  Additionally, Green's allegations that PRA was engaged in "robo signing" the affidavit of O'Toole, and attaching "a deceptive, misleading, and undated letter" would also violate the FDCPA and flies in the face of the very behavior against which the federal legislature is trying to protect.  The nature of PRA's noncompliance not only comes at a significant financial detriment to Green but is also in violation of one of the most basic and fundamental requirements under the FDCPA, to validate and verify the debt.  Finally, in addition to the aforementioned factors, PRA has history of violating FDCPA, which is a factor this Court "shall consider" in determining the amount of liability in this action.  *See* 15 U.S.C.A. § 1692k(b); *see also Wiley v. Portfolio Recovery Assocs., LLC*, 594 F. Supp. 3d 1127 (D. Minn. 2022); *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679 (7th Cir. 2017); *Bowse v. Portfolio Recovery Assocs., LLC*, 218 F. Supp. 3d 745 (N.D. Ill. 2016); *Litt v. Portfolio Recovery Assocs. LLC*, 146 F. Supp. 3d 857 (E.D. Mich. 2015).

### III. General District Court Recognizance

Next, Green seeks to challenge the general district court's issuance of a recognizance to her when trial was continued from May 2021 to July 2021. She argues that Code § 8.01-408[18] violates the Fourteenth Amendment and the FDCPA as applied to "the issuance of a [r]ecognizance on behalf of a debt collector."

Green's argument is waived. Her appeal challenges the *general district court's* decision to issue her a recognizance. But Code § 17.1-405 states that "any aggrieved party may appeal to the Court of Appeals from . . . any final judgment, order, or decree of a *circuit court* in a civil matter." Code § 17.1-405(A)(3) (emphasis added). This Court lacks jurisdiction to review a general district court's order.

### CONCLUSION

For all these reasons, we reverse and vacate the circuit court's judgment against Green and remand for the court to enter final judgment that Green does not owe a debt to PRA and to further consider Green's counterclaim against PRA.

*Reversed, vacated, and remanded.*

---

[18] Code § 8.01-408 provides:

> Upon the continuance of any civil case in a court, the court shall at the request of any party litigant require such party's witnesses then present to enter into recognizance in such penalty as the court may deem proper, either with or without security, for their appearance to give evidence in such case on such day as may then be fixed for the trial thereof.

Malveaux, J., concurring in part, and dissenting in part.

I join my colleagues in holding that this Court lacks jurisdiction to review the general district court's decision to issue a recognizance to Green. But I respectfully dissent from the majority's holding "that the assignment of rights alleged here [by PRA] created a standing issue." And I also respectfully dissent from the majority's holding with respect to Green's counterclaim.

## A. Standing

In her assignment of error relevant to this issue, Green asserts that the trial court erred "by finding that PRA was entitled to judgment against [her] . . . because PRA lacked standing to sue." In her argument developing this issue, Green contends that PRA lacked standing to sue because it failed to prove that it owned the debt it sought to collect from her. Green thus conflates an evidentiary sufficiency issue comprising part of PRA's case-in-chief with the issue of PRA's standing to bring that case in the first place, an error replicated by the majority in its opinion.[19] But as our Supreme Court makes clear in its recent decision in *Morgan*, "courts must not 'conflate the threshold standing inquiry with the merits of [a litigant's] claim.'" *Morgan v. Bd. of Supervisors of Hanover Cnty.*, ___ Va. ___, ___ (Feb. 2, 2023) (alteration in original) (quoting *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009)).

---

[19] *Compare McClary v. Jenkins*, 299 Va. 216, 221 (2020) ("[S]tanding to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action." (quoting *Andrews v. Am. Health & Life Ins. Co.*, 236 Va. 221, 226 (1988))), *with Little v. Cooke*, 274 Va. 697, 718 (2007) ("Generally, the appropriate way to test the sufficiency of evidence" during or after a trial on the merits "is by a motion to strike or by a motion to set aside a verdict."), *and Gabbard v. Knight*, 202 Va. 40, 43 (1960) (noting that "a motion to strike is an appropriate way of testing the sufficiency of relevant evidence to sustain an adverse verdict" on the merits and that "a motion to set aside the verdict [i]s an equally appropriate method of testing the sufficiency of the evidence" following a trial on the merits).

In *Morgan*, a number of homeowners challenged their county board of supervisors' approval of rezoning and special use permits authorizing construction of a large commercial facility near their homes. *Id*. at ___. The homeowners brought an action against the board, alleging that it had violated Virginia law and seeking declaratory and injunctive relief. *Id*. at ___. To support their standing to pursue their claims against the board, the homeowners alleged that the approved commercial facility would have a disproportionate effect on them beyond the effect experienced by the larger public and proffered "various likely scenarios of th[eir] particularized harm." *Id*. at ___. The circuit court dismissed the case on demurrers,[20] holding, among other things, that the homeowners' pleadings failed to allege a sufficient factual basis to establish standing. *Id*. at ___, ___. The Supreme Court reversed the circuit court and remanded the matter for further proceedings, after determining that the homeowners in fact had standing to assert all their claims. *Id*. at ___, ___.

In reversing the circuit court, the Supreme Court availed itself of the opportunity to engage in a thorough discussion of the fundamental distinction between standing and decision on the merits, noting that the standing requirement "can be satisfied without the necessity of asserting a plausibly successful claim on the merits" and that "'standing . . . is a preliminary jurisdictional issue having no relation to the substantive merits of an action.'" *Id*. at ___ (quoting *McClary v. Jenkins*, 299 Va. 216, 221 (2020)). This was so because fundamentally, "[t]he concept of standing concerns itself with the characteristics of the person or entity who files suit," rather than their likelihood of ultimate success. *Id*. at ___ (quoting *Anders Larsen Tr. v. Bd. of*

---

[20] The circuit court initially sustained demurrers to all counts of the complaint, holding that the homeowners lacked standing but granting leave to amend several counts. *Morgan*, ___ Va. at ___. The homeowners filed an amended complaint alleging additional details to support their assertion of standing, to which the circuit court also sustained demurrers. *Id*. at ___.

*Supervisors of Fairfax Cnty.*, 301 Va. 116, 120 (2022)). The Court further observed that "[t]his distinction, though subtle, plays an important role in the judicial process," because

> [n]early every form of judicial relief (damages, specific performance, injunctive remedies, extraordinary writs, etc.) requires proof of a specific legal right that was infringed and that is capable of being remedied by a court. If the standing analysis simply tracked this decisional sequence on the merits, it could create an absurdity: A court would never be able to decide the merits of a claim against a claimant because that would mean the court never had jurisdiction to address the merits in the first place.

*Id.* at ___. "Instead," the Court noted, "as 'a preliminary jurisdictional issue,' the standing doctrine asks only whether the claimant truly has 'a personal stake in the outcome of the controversy.'" *Id.* at ___ (quoting *McClary*, 299 Va. at 221-22); *see also McClary*, 299 Va. at 222 (noting the "personal stake" requirement and that "[t]ypically, to establish standing a plaintiff must allege a particularized injury that is separate from the public at large").[21] Considering the "personal-stake factors" germane to the specific context before it, the Court ultimately concluded that "[t]he homeowners' factual allegations in this case, when assumed to be true," satisfied the injury requirement "for purposes of standing."[22] *Id.* at ___.

---

[21] Reinforcing the fundamental standing/merits distinction, the Court in *Morgan* further "agree[d] that standing requires particularized harm to 'be fairly traceable'" to a defendant's actions, but noted that "the 'fairly traceable' concept 'does not mean that "the defendant's actions are the very last step in the chain of causation."'" If it did, then the standing analysis *would be no different from a merits analysis* that turned upon causation principles." *Morgan*, ___ Va. at ___ (emphasis added) (citations omitted) (quoting *Mattaponi Indian Tribe v. Va. Dep't of Env't Quality*, 261 Va. 366, 376 (2001)).

[22] The majority attempts to distinguish *Morgan* as irrelevant to Green's appeal, noting that "whether a plaintiff attempting to collect on a [debt]" where "proof that it owns the debt" is contested "raises a question of standing or a defect in the plaintiff's case-in-chief" has "only [been] considered" by Virginia courts "in the context of real property." But it is of no consequence that *Morgan* addresses this question in resolving a real property dispute. As noted above, the Supreme Court in *Morgan* engaged in a broad discussion of the analytical distinction between standing and decision on the merits and it made no representation that its holding about this fundamental distinction is limited to the real property context or lacks general applicability to all civil litigation. *See Morgan*, ___ Va. at ___; *see also id.* at ___ (noting that "[i]n zoning

- 27 -

I conclude that *Morgan* is controlling on the issue raised by Green's assignment of error and developed in her argument on brief. Whether PRA owned Green's debt was a matter for the circuit court to consider on the merits and did not create a standing issue, because proof of PRA's ownership of the debt went to the ultimate success or failure of PRA's claim and not PRA's "characteristics" as a creditor facing harm if a debt to it were not repaid. *Id*. at ___ (quoting *Anders Larsen Tr.*, 301 Va. at 120); *see also Howell v. McAuliffe*, 292 Va. 320, 330 (2016) ("Standing concerns itself with the characteristics of the individuals who file suit and their interest in the subject matter of the case."). As noted by the Court in *Morgan*, to have required PRA to prove ownership of the debt in order to establish standing could potentially have led to an absurd result, because "[i]f the standing analysis simply tracked th[e] decisional sequence on the merits," the circuit court "would never [have] be[en] able to decide the merits of [PRA's] claim against [it] because that would mean the court never had jurisdiction to address the merits in the first place." *Morgan*, ___ Va. at ___. Thus, to establish standing, PRA needed only to plead sufficient facts that, "*when assumed to be true*," would satisfy standing's "personal stake" or particularized harm requirement. *Id*. at ___ (emphasis added); *see also Howell*, 292 Va. at 330 ("[S]tanding can be established if a party *alleges* he or she has a 'legal interest' that has been harmed by another's actions." (emphasis added) (citation omitted)). Accordingly, I respectfully dissent from the majority's holding "that the assignment of rights alleged here [by PRA] created a standing issue."

Further, I do not reach the merits of the issue whether PRA proved it owned Green's debt and the circuit court erred in ruling in favor of PRA. As noted above, Green's assignment of error asserts that the circuit court erred "by finding that PRA was entitled to judgment against

cases, *no less than all others*, allegations of standing" require assertions of injury (emphasis added)).

- 28 -

[her] . . . because PRA lacked standing to sue." Green's assignment of error is thus limited solely to the issue of standing; it does not encompass the question of whether PRA's evidence at trial was sufficient to prove its ownership of Green's debt and thus to support the circuit court's judgment in favor of PRA. Although I am not unsympathetic to Green's circumstances, and her status as a *pro se* litigant in the circuit court and before this Court, I conclude that the limits of Green's assignment of error do not allow us to address any issue beyond standing. It is well established in Virginia, and recently has been reiterated by our Supreme Court, that "[t]he purpose of assignments of error is to point out the errors with reasonable certainty in order to direct [the] court and opposing counsel to the points on which appellant intends to ask a reversal of the judgment, and to limit discussion to these points."[23] *Moison v. Commonwealth*, ___ Va. ___, ___ (Oct. 19, 2023) (alterations in original) (quoting *Yeatts v. Murray*, 249 Va. 285, 290 (1995)). "In this way, '[a] properly aimed assignment of error must "point out" the targeted error and not simply take "a shot into the flock" of issues that cluster around the litigation.'" *Stoltz v. Commonwealth*, 297 Va. 529, 534 (2019) (alteration in original) (quoting *Forest Lakes Cmty Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 122 (2017)). An assignment of error thus "cabins the error that th[e] Court can consider." *Moison*, ___ Va. at ___; *see also* Rule 5A:20(e) (requiring an appellant's assignments of error to clearly frame the issues raised before the Court). And Virginia case law makes clear that a party "who represents h[er]self is no less bound by the rules of procedure and substantive law than a [party] represented by counsel." *Hammer v. Commonwealth*, 74 Va. App. 225, 236 (2022) (quoting *Townes v. Commonwealth*, 234 Va. 307, 319 (1987)); *see also Townes*, 234 Va. at 319 ("[T]he 'right of self-representation is not a license' to fail 'to comply with the relevant rules of procedural and substantive law.'" (quoting

---

[23] And even more recently, our Supreme Court made clear its disapproval of this Court addressing issues that were neither briefed nor argued by the parties. *See Commonwealth v. Puckett*, ___ Va. ___, ___ (Nov. 22, 2023).

- 29 -

*Faretta v. California*, 422 U.S. 806, 834 n.46 (1975))).  Accordingly, I do not reach the merits of whether or not PRA proved it owned Green's debt and the circuit court erred by ruling for PRA.[24]

### B.  Green's Counterclaim

Green assigns error to the circuit court for "finding that [her] FDCPA counterclaim failed because her counterclaim was never heard[,] violating due process."[25]  Here, the circuit court's final order of January 3, 2022, clearly indicates that Green's counterclaim was heard: "Green was present at this Circuit Court appeal and represented herself. . . .  Whereupon the Court heard the evidence presented on behalf of both parties and the argument of counsel . . . and . . . finds and determines that [Green]'s counterclaim fails and she is not entitled to judgment on same."  It is well-established that a "circuit court speaks through its orders," *Roe v. Commonwealth*, 271 Va. 453, 458 (2006), and that "such orders are presumed to reflect accurately what transpired," *Temple v. Mary Wash. Hosp., Inc.*, 288 Va. 134, 141 (2014).  Accordingly, because the circuit court heard Green's counterclaim against PRA, I would reject Green's due process argument and affirm the circuit court's judgment on the counterclaim.[26]

---

[24] Because I do not reach the merits of whether the circuit court erred by entering judgment on the debt in favor of PRA, I also do not reach the merits of Green's third assignment of error, which alleges that the circuit court erred by paying her cash bond to PRA.

[25] On brief, Green explicitly invokes only her due process rights under the Fourteenth Amendment to the Constitution of the United States.  Her argument, however, appears also to implicate her due process rights under Article I, Section 11 of the Constitution of Virginia.

[26] *See* my discussion, supra, of the controlling Virginia case law on the role of assignments of error in shaping and limiting an appellate court's analyses.